366 N.E.2d 686 (1977)
David J. COLMAN, Appellant (Petitioner below),
v.
Stephen HEIDENREICH, Appellee (Plaintiff below), and Michael Tabereaux and Charles Tabereaux, Appellees (Defendants below).
No. 1-477A92.
Court of Appeals of Indiana, First District.
August 30, 1977.
Rehearing Denied October 17, 1977.
*687 Paul Joal Watts, Spencer, for appellant.
Donald Robertson, Bunger, Harrell & Robertson, Bloomington, for appellee.
LOWDERMILK, Judge.

STATEMENT OF THE CASE
This is an interlocutory appeal, pursuant to Ind. Rules of Procedure, Appellate Rule 4(B)(5), from the trial court's denial of appellant David J. Colman's petition for a protective order, which protective order was sought, pursuant to Ind. Rules of Procedure, Trial Rule 26(C), in order to prohibit the parties of a lawsuit from inquiring during discovery into certain matters which Colman deemed to be privileged, because certain information concerning such matters was obtained by Colman, an attorney, during a business conversation with a client.

FACTS
The case which underlies this interlocutory appeal is a personal injury action by plaintiff-appellee Stephen Heidenreich against defendants-appellees Michael and Charles Tabereaux (hereinafter Tabereaux). Heidenreich, a track star at Indiana University, alleges that, while running along a country road, he was struck and injured by a car driven by Michael Tabereaux and owned by Charles Tabereaux.
Sometime prior to the suit between Heidenreich and Tabereaux, attorney David J. Colman, who was not involved in the Heidenreich-Tabereaux case, was advising an unidentified male client concerning certain legal matters, which involved that unidentified client and a lady friend of that client. During the course of that consultation, which transpired in the home of the unidentified male client, the client mentioned that his lady friend, who was also one of Colman's clients, was the person driving the car that struck Heidenreich.
Colman had learned from certain newspaper accounts that possible civil action and criminal charges were likely to be brought against Tabereaux. With this knowledge in mind, Colman informed the Monroe County Prosecutor of the substance of the information which had been related to him by his unidentified male client, that is, that a lady friend of that male client was the person who struck Heidenreich. Colman refused to identify either the male client or the client's lady friend, the female client. The prosecutor subsequently informed Tabereaux's counsel of the information which Colman had given him. The prosecutor also *688 informed Colman that immunity from criminal prosecution would be given to his female client, if she would come forward and identify herself.
Colman testified that he had never talked directly to his female client about the Heidenreich matter. Colman said that the male client seemed to be the spokesman for the pair. The male client asked Colman to keep his identity and that of his lady friend in confidence. In fact the male client said that his earlier communication concerning the woman's culpability was not true. It was Colman's opinion that, in spite of the later denial, the male client was telling the truth when he first spoke to Colman about the Heidenreich matter.
Tabereaux sought to discover from Colman the respective identities of Colman's unidentified male and female clients. Colman sought a protective order pursuant to TR 26(C), because he considered such information to be privileged in that it was obtained from a client within the scope of the attorney-client relationship. In denying Colman's protective order the trial court implicitly held that the communication from the male client to Colman was not a privileged communication and could therefore be discovered.

ISSUE
Several issues have been presented to this court for review; but since we have determined that the trial court erred on one of those issues, it is not necessary for us to address any other issue.
The issue to which we now address ourselves is whether the trial court erred in denying Colman's motion for a protective order, pursuant to TR 26(C).

DISCUSSION AND DECISION
Colman contends that the court erred in not granting his motion for a protective order, pursuant to TR 26(C). We agree.
Trial Rule 26 provides in part:
"(B) Scope of discovery. Unless otherwise ordered by the court in accordance with these rules, the scope of discovery is as follows:
(1) In general. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject-matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.
* * * * * *
(C) Protective orders. Upon motion by any party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the county where the deposition is being taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense... ." (Our emphasis)
The propriety of the trial court's denial of Colman's motion for a protective order hinges upon whether the information which Colman received from his unidentified male client arose from the attorney-client relationship, and was, therefore privileged. If the information were privileged, it would be outside the scope of discovery (TR 26(B)(1)), and would constitute good cause for which a TR 26(C) protective order should be granted.
IC 1971, XX-X-XX-X (Burns Code Ed.) provides in part:
"XX-X-XX-X [4-7408]. Duties of attorney.  It shall be the duty of an attorney:
* * * * * *
Fifth. To maintain inviolate the confidence, and, at every peril to himself, to preserve the secrets of his client."
*689 The ABA Code of Professional Responsibility DR 4-101 provides in part:
"(A) `Confidence' refers to information protected by the attorney-client privilege under applicable law, and `secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.
(B) Except when permitted under DR 4-101(C), a lawyer shall not knowingly:
(1) Reveal a confidence or secret of his client.
(2) Use a confidence or secret of his client to the disadvantage of the client.
(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.
(C) A lawyer may reveal:
(1) Confidences or secrets with the consent of the client or clients affected, but only after a full disclosure to them.
(2) Confidences or secrets when permitted under Disciplinary Rules or required by law or court order.
(3) The intention of his client to commit a crime and the information necessary to prevent the crime.
(4) Confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct."
The duty of an attorney to not reveal the secrets and confidences of his client is a sacred trust based upon the necessity of having a free flow of information from the client to the attorney. Without that free flow of information the attorney would be greatly hampered in his efforts to defend or promote the interests of his client. In Baird v. Koerner (1960), 279 F.2d 623, 629-30 (9th Cir.), the following statement was made:
"... While it is the great purpose of law to ascertain the truth, there is the countervailing necessity of insuring the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense. This assistance can be made safely and readily available only when the client is free from the consequences of apprehension of disclosure by reason of the subsequent statements of the skilled lawyer."
Based upon the policy arguments mentioned above, the need for the existence of the attorney-client privilege is readily discernible. However, it is a more difficult task to define the attorney-client privilege and to determine when it can be invoked. In VIII Wigmore, Evidence § 2292 (McNaughton rev. 1961) the following statement is found:
"(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived."
In the case at bar Colman contends that he was advising his unidentified male client concerning certain legal matters, when his client referred to the Heidenreich incident. Colman's testimony in that regard is as follows:
"Q. Have you had any conversations with that client which were not in the context of your relationship as attorney-client?
A. No. [Tr. p. 51, Ins. 18-21]
* * * * * *
Q. When the conversation on Heidenreich occurred, were you in the middle of your discussion with your client about his other problem or had that discussion terminated?
A. It was in mid-stream and it was something that he apparently considered to be relevant to the primary discussion.
Q. You mean your male client's problem had something to do with the Heidenreich matter?

*690 A. No, but it had something to do with my female client which brought in the Heidenreich matter. [Tr. p. 66, Ins. 20-29]
* * * * * *
Q. Would it be fair to characterize your male client's communication to you as a sort of volunteered aside that had nothing what so ever to do with why you were there?
A. No I don't think so. I mean I can't really explain the connection without revealing the communication and if I put it in its context that is tantamount to identifying both my clients and I don't consider it to have been an aside at all." [Tr. p. 69, lns. 15-22]
(Our inserts) (Our emphasis)
After Colman had talked to the prosecutor, he had another conversation with his unidentified male client, and he advised the client concerning the attorney-client privilege:
"I presented the fact that I had made the limited statement [to the prosecutor] ... and why I thought I had to do that, and explained to them why I had done that, and asked him for instructions on the privilege question, and was advised that he was invoking the privilege and that I should make no further comment about the matter to anybody." (Our insert) (Tr. p. 70, lns. 17-23)
It is clear from Colman's uncontroverted testimony that the conversation between Colman and his unidentified male client fits squarely within Wigmore's definitional statement, supra, concerning the attorney-client privilege: (1) Colman's male client sought legal advice concerning a problem which was mutual to the male client and his lady friend; (2) Colman was consulted in his capacity as an attorney, and not as a friend, accountant, scrivener, or in any other ministerial capacity; (3) the communication, though not the central problem, was related to the central problem; (4) the communication was made in confidence; (5) by the client; (6) as such, the communication was permanently protected; (7) from disclosure by the client or by Colman; (8) it is obvious that the privilege was not waived by Colman's limited revealment of part of the conversation, since the male client is the only one who could waive the privilege.[1]
Tabereaux contends that Colman has not clearly shown an attorney-client relationship between Colman and his female client. Therefore, Tabereaux contends that the information concerning the female client's culpability in regard to the Heidenreich incident is not privileged. We do not agree.
First of all, Colman's uncontroverted testimony would support the existence of an attorney-client relationship between Colman and his female client. However, even if no such attorney-client relationship were to be found in the case at bar, the information which Colman received was privileged in that it was related to him in a conversation with his male client. It was Colman's duty not to reveal any secret or confidence of his male client which was communicated during a privileged conversation.
Tabereaux also contends that the name or identity of a client is not a privileged matter, and should, therefore, be subject to discovery. As a general rule, it is correct that the identity of a client cannot be considered privileged information. However, at 16 A.L.R.3d 1050-1051 a recognized exception to the general rule is explained:
"While the disclosure of the name or identity of a client is generally held not, in and of itself, a matter within the attorney-client privilege, it has become so in situations in which so much has been divulged with regard to the legal services rendered or the advice sought, that to reveal the client's name would be to disclose the whole relationship and confidential communications. Thus, in a number of civil actions courts have declared a client's name privileged where the subject matter of the attorney-client relationship has been revealed; and in criminal *691 proceedings, particularly where the attorney is not the accused, courts have recognized that a client's name may be privileged if information already obtained by the tribunal, combined with the client's identity, might expose him to criminal prosecution for acts subsequent to, and because of, which he had sought the advice of his attorney." (Footnotes omitted) (Our emphasis)
In the case at bar it is obvious that since Colman related to the prosecutor much of the substance of the privileged communication, any disclosure by Colman of his client's identity would be tantamount to a disclosure of the whole relationship and the confidential communications pertaining thereto. As such the respective identities of Colman's unidentified clients are privileged.
Tabereaux's final contention is that no privilege exists with regard to the information communicated to Colman from his male client because such communication was in the furtherance of a crime or fraud. The general rule in relation to information, concerning a client's intent to commit a crime or fraud in the future, or his attempt to enlist the aid of his attorney in furtherance of a continuing crime or fraud, is not privileged information, even when the information was communicated within the framework of the attorney-client relationship.[2] However, information concerning a crime of fraud committed in the past is privileged when acquired within the framework of the attorney-client relationship.[3] The policy which underlies the privilege of silence concerning knowledge of past crimes or fraud which was obtained within the framework of the attorney-client privilege is obvious, because if such were not privileged, the opposing counsel could simply place the accused client's attorney on the stand and obtain any information which had been communicated to him. This would result in a situation where a client would be reluctant in confiding in his attorney at all.
In the case at bar there is no evidence of an attempt to foster a future or continuing crime or fraud. Any crime which may have been committed by Colman's female client was committed in the past. The only source of Colman's information, concerning his female client's possible involvement in the Heidenreich incident, was the privileged information which he obtained from his unidentified male client. It is clear that the female client's possible involvement in the Heidenreich matter was relevant, but ancillary to the primary problem discussed in the privileged conversation between Colman and his male client. Colman was not at liberty, nor is he compelled by law to reveal the privileged secrets or confidences of his male client, as they relate to his female client, even where such secrets or confidences would indicate that the female client had committed a crime. There exists in the case at bar a fundamental interdependence between the mutual problem of the male and female clients and the female client's involvement in the Heidenreich matter. Disclosure of the woman's identity would lead to the identification of the man, which in turn would give rise to a discovery of the whole relationship and the privileged communications pertinent thereto.
Conflicting policies are in issue in the case at bar. In 16 A.L.R.3d 1050 the following statement is made:
"It has been said that the reason underlying the attorney-client privilege is to encourage a client to disclose fully the facts and circumstances of his case to his attorney without fear that he or his attorney will be compelled to testify as to the communications had between them. Since the privilege results in the exclusion of evidence it runs counter to the widely held view that the fullest disclosure of the facts will best lead to the *692 truth and ultimately to the triumph of justice. In reconciling these conflicting principles the courts have pointed out that since the policy of full disclosure is the more fundamental one, the privilege is not to be viewed as absolute and is to be strictly limited to the purpose for which it exists." (Footnotes omitted)
The purpose of the attorney-client privilege is to allow the free flow of information between a client and his attorney; such information allows the attorney to properly evaluate his client's problems and to render competent advice based upon accurate information. To erode that privilege for any reason other than prohibiting the attorney from conspiring with his client to commit a crime or fraud would be to destroy the effectiveness of the legal profession. The result of any further erosion of the attorney-client privilege would be that the client would tell the attorney only those things which the client would want everyone to know, and not those things which his attorney would need to know in order to render competent advice. A game would result wherein fabricated or highly edited stories would give rise to advice based upon inaccuracies, a game in which the client would invariably be the loser.
In light of the pertinent law, which we have discussed above, we hold that the trial court erred in denying Colman's motion for a protective order concerning the identity of Colman's clients.
Ruling reversed and cause remanded to the trial court with instructions that Colman's protective order be granted.
ROBERTSON, C.J., and LYBROOK, J., concur.
NOTES
[1] See Key v. State (1956), 235 Ind. 172, 132 N.E.2d 143.
[2] See U.S. v. Aldridge (1973), 484 F.2d 655 (7th Cir.), Grummons v. Zollinger (1964), 240 F. Supp. 63 (D.C.Ind.), affirmed 341 F.2d 464 (7th Cir.), ABA Code of Prof. Resp. DR 4-101(C)(3), and VIII Wigmore, Evidence § 2298 (McNaughton rev. 1961).
[3] See 125 A.L.R. 508, et seq.