DAVID J. COLMAN *v.* STEPHEN HEIDENREICH, MICHAEL
TABEREAUX AND CHARLES TABEREAUX

[No. 1078S221. Filed October 13, 1978.]

*Paul J. Watts,* of Spencer, for appellant.

*Don M. Robertson, Bunger, Harrell & Robertson,* of Bloomington, for appellees.

PIVARNIK, J.—This case comes to us on a transfer petition from the Court of Appeals, First District. The Lawrence Circuit Court denied Attorney David Colman's Motion for Protective Order, relating to an assertedly privileged conversation with a client, on April 25, 1977. An interlocutory appeal was taken, in which the appellate court reversed the trial court and ordered that Colman's protective order be granted. *Colman* v. *Heidenreich,* (1977) Ind. App., 366 N.E.2d 686. Petitioner Heidenreich, a plaintiff in a personal injury case, asks this court to transfer the case and to set aside the judgment of the Court of Appeals.

The sole question for review concerns the scope of the attorney-client privilege, as it relates to a conversation between Attorney Colman and one of his clients.

This case presents a rather unusual set of factual circumstances. Petitioner Stephen Heidenreich, a long-distance runner for Indiana University's track team, was severely

injured by a hit-and-run driver while running on a county road near Bloomington, Indiana. Both a criminal prosecution and a civil suit were initiated against one Michael Tabereaux for being the alleged hit-and-run driver. While these causes were pending, attorney David Colman informed the prosecuting attorney in the criminal trial that during the course of legal counselling with a male client of his, this client disclosed that a female friend of the male client's was actually the one who hit Heidenreich. The prosecutor informed Tabereaux and his attorney of this information. It appears that there were no eyewitnesses to the accident, but there were certain items of demonstrative evidence available. It is Colman's claim that the "female friend" is also a client of his, although Colman does not claim that he ever talked to her about this matter to this day. The prosecutor offered the anonymous female immunity from criminal prosecution if she would come forward, but Colman indicated that he never conveyed this offer to the female.

This action arises from an attempt by Tabereaux to discover who the female was in order to extricate himself from the predicament of both the criminal and civil suits. In response, Colman invoked the attorney-client privilege as to both the male client and the female friend, and sought a Protective Order to prevent discovery of the identities of both of these individuals. The trial court denied the protective order and Colman filed this interlocutory appeal. The Court of appeals reversed the trial court and ordered it to invoke the protective order entirely. The order of the trial court of April 25, 1977, denying the protective order, provided for the time and place of an oral deposition, and ordered that Colman, if asked to do so, then reveal the name of his male client, the full conversation he had with this male client, and the name of the female friend his client had disclosed to him.

The attorney-client privilege is a very important provision in our law for the protection of persons in need of professional

legal help. It makes provision for a person to give complete and confidential information to an attorney, so that the attorney may be fully advised in his services to the client. At the same time, it assures the client that these confidences will not be violated. Our system is also based on the need and desire to get to the truth in order to render justice to those seeking it and requiring it, and thus establishes legal processes for requiring those who have facts about an incident to come forward and state them. In the present case we have a unique and rather delicate confrontation of these very sound provisions in our law. One must yield to the other, even though in this particular case it may eventually cause distress to one not deserving of it.

Several Indiana statutes and rules codify the attorney-client privilege. Ind. Code § 34-1-60-4 (Burns 1973), provides in part:

"Duties of attorney—It shall be the duty of attorney:

\* \* \*

Fifth. To maintain inviolate the confidence, and, at every peril to himself, to preserve the secrets of his client."

This duty of attorneys is stated in the same language in the Oath of Attorneys, Ind. R. Adm. & Dis. 22. It is also stated and discussed in ABA Canons of Professional Ethics No. 11, at EC 4-1, which says:

"Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss what ever he wishes with his lawyer and a lawyer must be equally free to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system. It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant. The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of

his client not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance."

The Disciplinary Rules to this section, at DR 4-101 (A), define a "confidence" and "secret" within the meaning of this ethical obligation and privilege as follows:

" 'confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested to be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

In sum, the rule is "that when an attorney is consulted on business within the scope of his profession, the communcations on the subject between him and his client should [3, 4] be treated as strictly confidential." *Jenkinson* v. *State*, (1840) 5 Blackf. 465, 466. *See also Thomas* v. *State*, (1969) 251 Ind. 546, 242 N.E.2d 919; *Fluty* v. *State*, (1946) 224 Ind. 652, 71 N.E.2d 565. *See generally* C. McCormick, Evidence §§ 87-95 (2d ed. 1972); VIII J. Wigmore, Evidence §§ 2290-2329 (McNaughton rev. 1961). As long as the communication is within this scope, it is of no moment to the privilege's application that there is no pendency or expectation of litigation. *Bigler* v. *Reyhler*, (1873) 43 Ind. 112. Neither is it of any moment that no fee has been paid. *Reed* v. *Smith*, (1850) 2 Ind. 160. *See also* ABA Opinion 216 (1941). Rather, what is essential to the privilege is a "confidential relation of client and attorney." *See Harless* v. *Pety*, (1884) 98 Ind. 53, 57; *Model Clothing House* v. *Hirsch*, (1908) 42 Ind. App. 270, 85 N.E. 719. Within such a confidential relation, the privilege applies to all communications made to an attorney for the purpose of professional advice or aid, upon the subject of the client's rights or liabilities. *Borum* v. *Fouts*, (1860) 5 Ind. 50, 53. The burden of proof is on the person asserting the privilege to show that the consultation was a professional one. *McKnew* v. *Superior Court*, (1943) 23 Cal.2d 58, 142 P.2d 1; *McGrede* v. *Rembert*

*National Bank,* (Tex. Civ. App. 1941) 147 S.W.2d 580; McCormick, *supra.*

The record of this case shows that at attorney Colman's action for a Protective Order, he was examined exhaustively about this incident by all parties. Colman testified that he had represented the male client for some three years, that the male client lived some seventy miles from Colman's office in Bloomington, and that it was not unusual for Colman to go to the client's home and discuss legal matters with him. He also stated there were matters in whch the male client and the client's female friend were both involved, and that they did come to his office together with a common problem. Colman had not seen or talked to the woman for a period of some eight months, although he said there were some matters involving her that could be considered continuing from his past representation of her. He talked to the man more than he did the woman, and he received his money from the man. He said when he received money from his male client he took it to be forthcoming for services rendered for the client's female friend too, although it was not expressed in that manner. There were times when Colman received a check from a third party that was payment of his fees for services rendered to both individuals. He said he did not send billings to either the man or the woman, but would collect fees from them which he found it necessary in the manner described above.

The conversation in which it was revealed to Colman that the woman was the driver of the car causing the injuries involved here, took place at the male client's residence and in the absence of the woman. The legal matters being discussed were those of the male client only, and did not involve the female. Colman's testimony on this question, at the hearing on the protective order, was a follows:

"Q. When the conversation on Heidenreich occurred were you in the middle of your discussion with your client

about his other problem or had that discussion terminated?

A. It was in mid-stream and it was something that he apparently considered to be relevant to the primary discussion.

Q. You mean your male client's problem had something to do with the Heidenreich matter?

A. No, but it had something to do with my female client which brought in the Heidenreich matter.

Q. I assume they're friends of each other?

A. I believe so, yes.

Q. Is there any other relationship between them besides friendship?

A. Not that I'm aware of.

Q. What I'm curious about is does the man speak for the woman? Does he act as her agent in hiring attorneys and things of this nature. Is that the way it works?

A. It is—and this is just my impression from having dealt with them—that that is the case, yes.

Q. He sort of acts as her agent at least in dealing with you?

A. Yes, I think probably he selected me as attorney for both of them and I think generally yes, that is the situation. He sort of serves as the spokesman.

Q. Now when you worked on her problems did you deal with her directly or did you always deal through the man?

A. No, I dealt with her directly.

Q. Was the man always present?

A. No.

Q. Was the man ever present?

A. Yes.

Q. Now at the time the conversation about Heindenreich took place at this person's residence, was anyone else present besides you and the man?

A. Not in the room, no.

Q. I take it you qualified it for some reason. Would you expand on that please?

A. Well, you know, I can only speak for the immediate environment and the room that we were in. There wasn't anyone else there. That's all I can testify to.

Q. Now when the man told you about his girlfriend—is that the way you phrased it?

A. I think he used her name.

&ast; &ast; &ast;

Q. Did you give advice to or did they seek your advice— the man seek your advice about his girlfriend in regard to the Heidenreich matter?

A. I know I gave my advice about it. I would assume—I don't remember him specifically saying what do you advise us to do, but I know I responded the presentation with advice.

Q. Would it be fair to characterize your male client's communication to you as a sort of volunteered aside that had nothing whatsoever to do with why you were there?

A. No, I don't think so. I mean I can't really explain the connection without revealing the communication and if I put it in its context that is tantamount to identifying both my clients and I don't consider it to have been an aside at all.

Q. Do you consider it to have been a request for legal advice on her behalf?

A. That is the way I responded to it at the time. Now I can't speak for his intent. That's how I responded to it.

Q. Did you respond in some detail?

A. No. No, I think my response was general.

Q. Now did you not ever talk with the woman about this matter, did you?

A. No, I did not."

Colman also testified that his male client had said that his girlfriend was not acting well and was acting strangely on the day in question. When Mr. Colman asked him about it, the client then asked something about the runner that had been hit earlier that year. Colman asked him what that had to do with his girlfriend not feeling well or acting well, and the client stated, "Well, my girlfriend was the one who hit Steve Heidenreich." Colman's testimony was that no details were given to him of the incident by the male client, such as how the accident occurred or any other facts of the incident. He said the conversation was very brief and included only the fact that she had been one who was driving the car. It appears to be clear that the male client was not

involved in the Heidenreich matter in any way. It also appears clear that the male client's knowledge of the Heidenreich matter comes only from the disclosure from his female friend to him. The record does not show that Colman has talked to the woman about this incident or that he discussed it further with the male client, except to advise the client that he had talked to the prosecuting attorney, and to be instructed by the male client not to further reveal the conversation to anyone.

It is readily apparent in this situation that the secret of the male client here is his relationship with the female client. There was testimony that they were not married to each other, and that Colman had knowledge of their relationship by reason of his representation as an attorney. There is no detriment that could come to the male client in revealing his knowledge of this woman's involvement in the accident, as it clearly appears that he himself was not involved and his only knowledge of it is the admission from her that she was. Requiring Colman to reveal the male client's identification along with the identification of the woman would then publicly reveal their relationship. This would appear to fall under DR 4-101(A), *supra,* as a disclosure that would be embarrassing or detrimental to the client.

The revelation of the identification of the female friend of Colman's client does not appear to be so protected. It is true, as the Court of Appeals pointed out, that the identification of a client is not usually considered privileged, except where so much has been divulged with regard to the legal services rendered or the advice sought that to reveal the client's name would be to disclose the whole relationship and confidential communications. *Colman, supra,* 366 N.E.2d at 690-91. It has been held that whether the client's identity is privileged depends on the facts of each case. *Baird* v. *Koerner,* (9th Cir. 1960) 279 F.2d 623; *State* v. *Bean,* (Iowa 1976) 239 N.E.2d 556; *Chamberlain v. Mis-*

*souri Elections Comm'n,* (Mo. 1976) 540 S.W.2d 876. It must be noted that the question of whether or not the female involved was actually a client of Colman's was disputed in the lower court, and Tabereaux contends that there is no proof that she was in fact a client, other than the oral testimony of Colman who has identified neither of these parties. The transcript and record clearly show that Colman has never discussed this matter with his client's female friend. The information given to Colman by the male was not done at the behest of the woman, or in a situation in which the male client was acting as an agent or channel through which to discuss the Heidenreich matter or seek advice on it. The woman has not asked Colman for advice or sought his counsel or representation in the entire matter. There is thus no secret or confidence as defined in any of our laws involving attorney-client privlege, that would justify the court in giving protection of her identity as the alleged driver. There was no "confidential relation" between her and Coleman on the Heidenreich matter. Thus, no privilege can extend to her, via the male client, on the revelation of her identity. Further, giving her identity does not reveal the relationship between the woman and the male client, nor works a detriment or distress on the male client who was seeking advice from his attorney, except perhaps to cool the relationship between these two persons when she realizes that the male client has revealed her identity to Colman. Even though the Heidenreich matter was mentioned by the male client during a session with his lawyer in which confidences and secrets were given, it did not concern the subject matter of that attorney-client relationship. It did not concern the rights, liabilities, or other legal problems of the male client that he was discussing with his attorney. Thus, as to the male client, disclosure of the woman's name causes no breach of his assurance of privilege. As noted by one commentator:

> "A . . . problem. is presented when, while the parties are discussing the client's legal problems, the client says some-

thing aside from the point at hand. This might be considered as dispelling the professional relationship, but a better analysis would seem to be that the relationship continues as long as the parties remain on the general subject, but if the client makes remarks which could not reasonably be intended to further the purpose of the conversation, these particular communications are not privileged."

*Note, Nature of the Professional Relationship Required Under The Privileged Communication Rule,* 24 Iowa L. Rev. 539, 543 (1939). *Accord, Wery* v. *Pacific Trust Co.,* 33 Hawaii 701, 704 (1936); *Mayers v. Fogarty,* (1909) 140 Iowa 701, 714-16, 119 N.W. 159, 164-65; *State* v. *Mewherter,* (1877) 46 Iowa 88, 93-94; *Denunzio's Receiver* v. *Scholtz,* (1903) 117 Ky. 182, 190-94, 77 S.W. 715, 716-17; *Flack's Administrator* v. *Neill,* (1862) 26 Tex. 273, 276.

The judgment of the trial court in denying the protective order provided that Colman was to reveal the names of both of these individuals, as well as the conversation between himself and the male. We believe this order went too far. However, we also feel that the Court of Appeals erred when it ordered the trial court to institute the protective order as to all of the above matters. To reveal the name of the male client would be to require Colman to violate the privilege of that client, and the protective order was properly invoked for that purpose. To require Colman to give conversations of his client would, therefore, also violate that privilege, and would in any event be of little value here as it appears the conversation did nothing more than identify the woman as the driver. Further, the substance of the conversation is apparently almost totally in the record already in Colman's testimony. His testimony was that there were no other details given, and the only value of the male client as a witness would be to testify that she made the admission to him. All of the admissions that she made to him, of course, are not in the knowledge of Colman, and thus Colman could also not testify about the Heidenreich matter.

We do feel, however, that the trial court was proper in ordering Colman to reveal the identification of the female involved.

We, therefore, take transfer in this case, order the judgment and opinion of the Court of Appeals vacated, and direct the trial court to change its order consistent with this opinion.

Givan, C.J., Hunter, Prentice, JJ., concur; DeBruler, J., dissents with opinion.

### DISSENTING OPINION

DEBRULER, J.—The majority, after having set forth prevailing legal thought and the legal standards applicable to deciding whether a communication is to be considered confidential by reason of the attorney-client privilege, does not permit its decision to be determined by such thoughts and standards as did the Court of Appeals. The attorney testified that the information at stake was imparted to him in an oral statement made by a client in the *middle* of an interview being conducted for the purpose of providing the client legal advice. The client believed that this information "was relevant to the primary discussion." The lawyer believed that it was not a mere "volunteered aside," and actually provided legal advice in response to it. Surely this satisfies every legal test espoused in the majority opinion for determining when a communication between client and lawyer shall be deemed a confidential communication.

NOTE.—Reported at 381 N.E.2d 866.