**Patricia Hilsmeyer ROCCA,**
**Appellant–Respondent,**

v.

**SOUTHERN HILLS COUNSELLING**
**CENTER, INC., Appellee–**
**Petitioner.**

No. 19A01–9601–CV–10 [1].

Court of Appeals of Indiana.

Oct. 18, 1996.

Rehearing Denied Dec. 10, 1996.

---

1. This panel of the court, on its own motion, held an oral argument addressing the issue of whether Southern Hills' conduct constituted a cause of action which is within the purview of the Medical Malpractice Act. Ind.Code 27–12–10–1. After due consideration, we conclude that the application of the Medical Malpractice Act is proper.

Gerald W. Mayer, Indianapolis, for Appellant–Respondent.

Neil B. Chapman, William E. Statham, Statham, Johnson & McCray, Evansville, for Appellee–Petitioner.

## OPINION

ROBERTSON, Judge.

Patricia Hilsmeyer Rocca filed a proposed malpractice complaint against Southern Hills Counseling Center, Inc., in which she claimed that Southern Hills had failed to follow the applicable standard of care when it had disclosed matters related to her mental health records to a third party. A medical review panel formed to consider the proposed complaint. Pursuant to Indiana's Medical Malpractice Act, Southern Hills filed a petition for a preliminary determination of law with the Dubois Circuit Court for matters then pending before the medical review panel. The trial court determined that, as a matter of law, the applicable statute "did not prohibit Southern Hills from making the disclosure of the death threats made by Patricia Hilsmeyer–Rocca." On appeal, Rocca claims the determination of the trial court is erroneous. We affirm.

In a medical malpractice case, a trial court has only limited jurisdiction prior to the submission of an expert opinion by a medical review panel. *Dixon v. Siwy,* 661 N.E.2d 600 (Ind.Ct.App.1996). Most pertinent to the present case, a trial court has jurisdiction, before the panel has rendered an opinion, to determine issues of law or fact that may be preliminarily determined under Trial Rule 12(D). *Id.* The trial court, however, has no jurisdiction to rule preliminarily upon any issue of law or fact preserved for a written opinion by the medical review panel. *Id.* Issues preserved for the review panel include those pertaining to whether the defendant failed to meet the standard of care in treating the plaintiff, and it is clear that the trial court has no jurisdiction to rule upon whether the defendant met the standard of care until the review panel has submitted its report. *Id.* Further, Trial Rule 12(D) allows preliminary determination of defenses specifically enumerated in Trial Rule 12(B)(1) through (8). T.R. 12(D). If an assertion of the defense of failure to state a claim upon which relief can be granted contains matters outside the pleadings, then the motion shall be treated as one for summary judgment and disposed of accordingly. T.R. 12(B). We note that, even though there may be conflicting facts or conflicting inferences which might be drawn from undisputed facts as to certain elements of a claim, summary judgment is nevertheless appropriate where there is no real conflict regarding a fact dispositive of the litigation. *Stump v. Indiana Equipment Co., Inc.,* 601 N.E.2d 398, 407 (Ind.Ct. App.1992), *trans. denied.*

The evidence reveals that Rocca had a history of substance abuse for which she had sought treatment from Southern Hills, among others. In December of 1985, someone murdered Rocca's daughter. Rocca sought inpatient treatment for depression. Eventually, Rocca was the subject of an involuntary commitment at Southern Hills with an emergency detention. Southern Hills then petitioned the trial court for a regular, involuntary commitment order based upon Rocca's depression and substance abuse and because she was a danger to herself and others. The trial court issued the order of involuntary commitment, and Southern Hills soon placed Rocca on an outpatient treatment regimen as a part of her involuntary commitment. During the course of treatment, Rocca stated on several occasions that she would kill herself and the man accused of the murder of her daughter.

The Southern Hills staff met and decided that someone should inform the accused murderer about Rocca's death threats. A therapist from Southern Hills contacted the attorney for the accused and informed him of the threats. Rocca was not informed about the proposed disclosure and did not consent to the actual disclosure. After the disclosure, some details of Rocca's medical treatment became public. Rocca claimed the disclosures caused her damage. Rocca alleged in her proposed complaint to the Indiana Department of Insurance that she was under the care of Southern Hills and that Southern Hills was careless and negligent in its care and treatment of her. Specifically, Rocca claimed that, as a direct and proximate result of the Southern Hills negligence:

1) she was fired from her job and lost wages;

2) publicity was given to her most intimate thoughts and feelings;

3) she incurred medical expenses;

4) she suffered humiliation, embarrassment, pain and suffering, and emotional distress; and

5) her belief that she could be helped by the therapeutic process was destroyed at a time when she most needed it.

Rocca claims that the information Southern Hills obtained during her treatment was confidential and that Southern Hills should not have disclosed her threats to anyone. She claims Southern Hills breached the applicable standard of care when it did so.

We first examine whether Southern Hills had a duty to keep the information confidential. On appeal, Rocca does not claim such a duty arises in the areas of tort, *see Doe v. Methodist Hospital,* 639 N.E.2d 683 (Ind.Ct. App.1994) (public disclosure of private facts), or of contract, *see* Ind.Code 16–9.5–1–1(h) ("malpractice" means tort or breach of contract). She claims the duty exists pursuant to a mental health records statute in effect at the time of the disclosures:

> All information obtained and maintained in the course of providing services to a patient or client is confidential and shall be disclosed only with the consent of the patient or client, unless otherwise provided in IC 16–4–8–7, in this section, or in section 8.5 of this chapter.

I.C. 16–14–1.6–8(b). As Rocca correctly notes, none of the exceptions provided in the statutes apply under the facts of this case. As we discuss later in this opinion, our legislature had not yet passed a statute related to immunity from liability for disclosure of confidential information when Southern Hills disclosed the death threats in the present case.

■ Southern Hills first claims that I.C. 16–14–1.6–8(b) applies only to written or printed records. The subsection plainly states, however, that it applies to all information obtained and maintained. During the course of treatment, Southern Hills obtained information about the death threats Rocca made and maintained that information in her mental health record. As far as the language of the statute is concerned, the information was confidential and should have been disclosed only with Rocca's consent.

■ The language employed in the statute leads inescapably to the conclusion that Southern Hills had a duty to keep the information confidential and not disclose it. Southern Hills claims, however, that any statutory duty to keep the information confidential existed in conjunction with an affirmative duty to disclose the information to the accused murderer.

At this point, we emphasize that we remain cognizant of those issues not involved in the present case and keep focused upon those issues properly before us. Here, we do not address whether Southern Hills owed a duty to the accused murderer to conform its conduct to a standard of care which might have arisen from the relationship among the accused, Rocca, and Southern Hills. This case does not involve a lawsuit between the accused murderer and Southern Hills. In the present case, a patient has sued her health care provider for unauthorized disclosure of confidential information and the health care provider has asserted that it justifiably disclosed the information under the circumstances as they existed at the time.

■ At the time of the disclosure, our legislature had not yet passed I.C. 34–4–12.4–1 through 4, an enactment which relates to immunity for a failure to warn reasonably identifiable victims. Southern Hills nonetheless claims that the statutes merely codify a part of our common law which allows Southern Hills an immunity from liability for disclosure of Rocca's death threats.

We therefore must consider whether our common law recognizes an exception to the statutory duty to keep matters confidential. Southern Hills notes that principles of medical ethics support the disclosure of confidential matters if such a disclosure becomes necessary in order to protect the welfare of the individual or of the community. For the reasons listed below, we conclude that public policy supports such a disclosure of confidential information.

We begin our consideration of those public policy principles with the examination of certain Indiana statutes. We note that the mental health records statute is a provision which deals with confidential information but that our legislature has enacted other statutes which also involve such information. The effort to protect confidential information from disclosure certainly is no stranger to either the legal profession or the medical profession.

■ One method the legislature has employed to protect confidential information is the enactment of a statutory privilege, such as the attorney-client privilege and the physician patient privilege:

> Except as otherwise provided by statute, the following persons shall not be competent witnesses:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (2) Attorneys, as to confidential communications made to them in the course of their professional business, and as to advice given in such cases.
>
> (3) Physicians, as to matters communicated to them, as such, by patients, in the course of their professional business, or advice given in such cases.

I.C. 34-1-14-5. *See also,* I.C. 34-1-60-4 (duties of attorney to maintain confidence). Our supreme court has noted the following about the physician-patient privilege:

> This privilege did not exist at common law, but was statutorily created "for the purpose of extending to the relation between a patient and his physician the same rule of public policy by means of which the common law protected the professional confidence necessarily existing between a client and his attorney." *Masonic Mut. Benefit Ass'n v. Beck* (1881), 77 Ind. 203, 210. The keeping of professional confidences existing between an attorney and client is enforced by two mechanisms, I.C. 34-1-14-5, which renders attorneys incompetent to testify, and Ind. Professional Conduct Rule 1.6, which forbids attorneys to "reveal information relating to representation of a client unless the client consents after consultation." The rationale underlying the attorney-client privilege, which was recog-

nized at common law, and scope of the enforcement mechanisms have been explained by this Court as follows:

> A fundamental principle in the client-lawyer relationship is that the lawyer maintain confidentiality of information relating to the representation. The client is hereby encouraged to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter.
>
> The principle of confidentiality is given effect in two related bodies of law, attorney-client privilege (which includes the work product doctrine) in the law of evidence and the rule of confidentiality established in professional ethics. The attorney-client privilege applies in judicial and other proceedings in which a lawyer may be called as a witness *or otherwise required to produce evidence concerning a client.* The rule of client-lawyer confidentiality applies in situations other than those where evidence is sought from the lawyer through compulsion of law.

Prof.Cond.R. 1.6 comment (emphasis added). The attorney-client privilege protects against judicially compelled disclosure of confidential information regardless of whether the information is to be disclosed by way of testimony or by court-ordered compliance with a discovery request which a party has attempted to resist. The harm to be prevented is not the manner in which the confidence is revealed, but the revelation itself.

By creating the physician-patient privilege, which is codified in the same statute as the attorney-client privilege, I.C. 34-1-14-5, the legislature statutorily recognized the societal value of protecting the confidences existing within that professional relationship, and this Court interpreted this legislative act as affording as much protection to physician-patient confidences as is provided to attorney-client confidences because of the marked similarity of interests being protected. *Beck,* 77 Ind. 203. We explained in *Collins v. Bair* (1971), 256 Ind. 230, 268 N.E.2d 95, that the physician-patient privilege

has been justified on the basis that its recognition encourages free communications and frank disclosure between patient and physician which, in turn, provide assistance in proper diagnosis and appropriate treatment. To deny the privilege, it was thought, would destroy the confidential nature of the physician-patient relationship and possibly cause one suffering from a particular ailment to withhold pertinent information of an embarrassing or otherwise confidential nature for fear of being publicly exposed.

*Id.* at 236, 268 N.E.2d at 98. As is the case with the attorney-client privilege, the keeping of confidences existing within the physician-patient relationship is enforced in judicial proceedings by the rules of evidence, which preclude compelled testimony or production of evidence, and by the ethical rules of the medical profession, which prohibit disclosure of confidential information in non-judicial settings.[2]

*Canfield v. Sandock,* 563 N.E.2d 526, 528–529 (Ind.1990). The court further stated:

The Hippocratic Oath imposes on physicians a duty to maintain confidences acquired in their professional capacity, as do the Oath of Attorneys and the Rules of Professional Conduct on attorneys. The boards governing the various areas of medical speciality police and enforce medical ethics just as our Disciplinary Commission ensures adherence to or sanctions deviations from legal ethics.

*Id.* at 529 n. 2.

The above analysis is instructive on the subject of confidentiality. The present case does not involve a traditional privilege but a statute which provides that "all information obtained and maintained in the course of providing services to a patient or client is confidential" and that the client's "record is not discoverable or admissible in any legal proceeding without the consent of the client." I.C. 16–14–1.6–8(b) and (f). Here, two related bodies of law support the principle of confidentiality: the statute, which, in part, addresses evidentiary matters related to legal proceedings; and the rule of confidentiality established in professional ethics, which prohibits disclosure of confidential information in non-judicial settings. The analysis provided above and the language of the statutes demonstrate that, in general, public policy supports the protection of confidential information from disclosure.

The legislature, however, has recognized that public policy supports the disclosure of confidential information under some circumstances. In 1987, the legislature passed I.C. 34–4–12.4–4, which provides that a mental health service provider who discloses certain confidential information "is immune from civil and criminal liability under Indiana statutes that protect patient privacy and confidentiality." Rocca contends that the statute does not apply in the present case because the disclosure occurred in 1986, before the statute became effective. While we agree that the statute does not apply here, the principles the legislature considered when it enacted the provision existed before the effective date of the statute. The legislature merely acted upon those principles when it eventually passed the statute, and we should not ignore those principles merely because the subsequently passed statute does not happen to apply here. Therefore, in general, public policy supports the disclosure of confidential information under appropriate circumstances.

■ Moreover, our courts have recognized that public policy supports some disclosures of confidential information. Our Rules of Professional Conduct contain an example of a situation in which the reasons for disclosure may outweigh the reasons for protection of confidential information. Under Ind.Professional Conduct Rule 1.6:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

(b) *A lawyer may reveal such information to the extent the lawyer reasonably believes necessary:*

(1) *to prevent the client from committing any criminal act . . .*

(Emphasis added.) As the comment to the rule states:

the lawyer may learn that a client intends prospective conduct that is criminal. As stated in paragraph (b)(1), the lawyer has professional discretion to reveal information in order to prevent such consequences. The lawyer may make a disclosure in order to prevent homicide or serious bodily injury which the lawyer reasonably believes is intended by the client. It is very difficult for the lawyer to "know" when such a heinous purpose will actually be carried out, for the client may have a change of mind.

*Accord Colman v. Heidenreich,* 366 N.E.2d 686 (Ind.Ct.App.1977), *vacated,* 269 Ind. 419, 381 N.E.2d 866 (Code of Professional Responsibility DR 4-101(C)(3) allows that a lawyer may reveal the intention of his client to commit a crime and the information necessary to prevent the crime). Our Rules of Professional Conduct are not dispositive of the issues raised in this appeal, but the principles reflected there are powerful and persuasive on the issue before us. Therefore, in general, public policy supports the disclosure of confidential information where the person reasonably believes it is necessary to prevent a client from committing a criminal act.

▮ Further, the courts have not limited the principle just described to the attorney-client relationship. Our supreme court has noted, with regard to the statutory, physician-patient privilege:

We should keep in mind that the objective of the privilege in such cases is namely to inspire full and complete disclosure of knowledge pertinent and necessary to a trustful and proper relationship in such cases. Where that objective is not served and the privilege is used to conceal the commission of a crime, it has no social value and serves no public purpose but in fact is turned into a shield to the criminal and the commission of the crime. We have held that a physician may testify to being consulted and even aiding in the performance of an illegal abortion in this state. *Seifert v. State* (1903), 160 Ind. 464, 67 N.E. 100. It has been stated as a general proposition that professional communications are not privileged when made for an unlawful purpose having for their objective the commission of a crime. *Seifert v. State, supra.*

\* \* \* \* \* \*

The statute may not be used when its objective is not served but rather would be used as a shield for criminal activity. In such cases it has no public policy or social value.

*Green v. State,* 257 Ind. 244, 255, 257, 274 N.E.2d 267, 273 (1971). *Accord, Myers v. State,* 192 Ind. 592, 137 N.E. 547 (1922) (the offered evidence, that the victim had said of the defendant, "I will get her yet, damn her; I will get her yet," should have been admitted over objection that the statement fell within the physician-patient privilege); *Seifert v. State,* 160 Ind. 464, 67 N.E. 100 (1903) (notwithstanding the broad language of the [physician-patient privilege statute], we think that a request to a physician to commit a crime is not privileged). Thus, public policy supports the recognition of an exception to the physician-patient privilege despite the absence of language to that effect in the statute which established the privilege. The exception exists where the communications were made for an unlawful purpose, the objective of which is the commission of a crime.

As noted above, Rocca has not claimed that the duty to keep her death threats confidential arises from a relationship based upon tort or contract but upon I.C. 16-14-1.6-8. Like the physician-patient privilege, I.C. 16-14-1.6-8 is a creation of the legislature, deals with confidential information, and limits the admissibility of evidence. As with the physician-patient privilege, the purpose of mental health records statute is not served where the communication is made for an unlawful purpose having for its objective the commission of a crime. Moreover, as with attorney-client confidentiality, the purpose of the mental health records statute is not disserved where disclosure of confidential information will prevent the client from committing a criminal act. Therefore, the same public policy principles which recognized an exception to the physician-patient privilege and which recognized an attorney's discretion to disclose confidential information also support

the recognition of a similar exception and disclosure under I.C. 16–14–1.6–8.

Here, Rocca communicated death threats against the accused murderer of her daughter to the staff of Southern Hills. Later, Southern Hills disclosed the existence of the death threats to the accused's attorney. The disclosure promoted the prevention of a criminal act against the accused at the hands of Rocca, and public policy supports the determination that the disclosure was a matter within the discretion of Southern Hills' staff. Under the undisputed facts presented here, Southern Hills did not act unreasonably or contrary to the purpose of the mental health records statute when it disclosed the death threats to the accused's attorney.

■ Rocca relies upon authority which states that the legislature determines the public policy of the State through the enactment of statutes and that it may modify or change the rule at common law when it exercises its power. *See Bissell Carpet Sweeper Company v. Shane Company*, 237 Ind. 188, 143 N.E.2d 415 (1957). Rocca maintains that, even if the common law would have shielded Southern Hills before the enactment of the mental health records statute, the legislature removed the shield with its passage of I.C. 16–14–1.6–8.

■ We presume that the legislature does not intend by the enactment of a statute to make any change in the common law beyond what it declares, either in express terms or by unmistakable implication. *Nicholas v. Baldwin Piano Co.*, 71 Ind.App. 209, 123 N.E. 226 (1919). An abrogation of the common law will be implied where a statute is enacted which undertakes to cover the entire subject treated and was clearly designed as a substitute for the common law or where the two laws are so repugnant that both in reason may not stand. *Id.*

For many years, this Court has recognized those principles of public policy which justify the existence of the above exception to the physician-patient privilege despite the absence of any exception language in the statute. Further, as related above, our courts have long recognized the discretion of an attorney to disclose confidential information to prevent the commission of crimes. Despite these recognitions of these public policy matters, the legislature included no provisions in the language of I.C. 16–14–1.6–8, either in express terms or by unmistakable implication, to the effect that the common law provisions related to commission of crimes are not applicable to the mental health records statute. Further, the legislature did not undertake to cover the entire subject of privilege or of confidential communications related to mental health with the passage of I.C. 16–14–1.6–8 and did not design the statute as a substitute for the common law. For example, the legislature has provided that a certified psychologist may not disclose any information acquired from persons with whom the psychologist has dealt in a professional capacity, except under certain circumstances, including circumstances under which privileged communication is abrogated under the laws of Indiana. I.C. 25–33–1–17(6). Therefore, we do not conclude that the legislature abrogated the common law principles related above when it enacted the mental health records statute.

We therefore observe the following. Southern Hills had a statutory duty to keep the information about the death threats confidential, but long recognized public policy supports an exception to the statute and gave Southern Hills the discretion to disclose the information because such disclosure promoted the prevention of a crime on the part of Rocca. Further, the legislature did not expressly or implicitly change or abrogate those public policy matters when it enacted the mental health records statute. Under the circumstances, Southern Hills did not act unreasonably or contrary to the purpose of the mental health records statute when it disclosed the death threats to the accused's attorney. The trial court therefore correctly concluded that I.C. 16–14–1.6–8 did not prohibit Southern Hills from making the disclosure of the death threats.

■ Rocca notes that the trial court employed the phrase "death threats" in its order. She claims that whether she actually made death threats is a controverted question of fact which the trial court had no authority to decide upon a preliminary deter-

mination of the law. She claims that, even if an exception to I.C. 16–14–1.6–8 exists, this Court should nevertheless reverse the order of the trial court with instructions that the trier of fact decide whether she actually made any death threats.

Rocca threatened harm, including homicide, against the accused murderer of her daughter. A threat is a communicated intent to inflict physical or other harm on a person or property or a declaration of an intention to injure another or his property by some unlawful act. BLACK'S LAW DICTIONARY 1327 (5th ed.1979). We agree with Southern Hills that the determination about whether Rocca made a death threat does not depend upon whether she subjectively intended to unlawfully inflict the harm or injury actually communicated. Under the undisputed facts of the case, the trial court appropriately determined that Rocca's declarations were death threats.

Finally, Rocca claims that Southern Hills has misstated certain matters in its brief to this court. The material that Rocca has identified is not dispositive of this appeal. We therefore deny her request to strike the statements.

Judgment affirmed.

SHARPNACK, C.J., and BAKER, J., concur.