
FILED

Jan 09 2017, 8:23 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregory Bowes
Greg Bowes Legal Services, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Joseph C. Chapelle
Mark J. Crandley
Barnes & Thornburg LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William Groth, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> Mike Pence, as Governor of the State of Indiana, <br> *Appellee-Defendant.* | January 9, 2017 <br><br> Court of Appeals Case No. <br> 49A04-1605-PL-1116 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Michael D. Keele, Judge <br><br> Trial Court Cause No. <br> 49D07-1506-PL-21548 |

**Najam, Judge.**

## Statement of the Case

[1]     The Indiana Access to Public Records Act ("APRA") provides that "it is the public policy of the state that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees." Ind. Code § 5-14-3-1

(Supp. 2014). Thus, in APRA our legislature declared that transparency in government is the public policy of the State of Indiana. But the public's right of access to public records is also subject to well-recognized exceptions under APRA.

In December of 2014, Governor Mike Pence made the decision that Indiana would join a Texas lawsuit against the President of the United States to contest certain presidential executive orders on immigration. In response, William Groth, a private citizen, submitted an APRA public records request to the Governor for records related to the Governor's decision. The Governor responded to Groth's request but, in doing so, partially redacted some of the documents and withheld another. The Indiana Public Access Counselor concluded that the Governor did not violate APRA. Acting on Groth's ensuing complaint, the trial court also concluded that the Governor's response was proper under APRA.

On appeal, the parties raise the following four issues for our review:

1. Whether the Indiana Supreme Court's recent opinion in *Citizens Action Coalition of Indiana v. Koch*, 51 N.E.3d 236 (Ind. 2016), requires Indiana's courts to abstain from reviewing the Governor's decision to redact or withhold certain records from public disclosure.

2. Whether the trial court violated Groth's due process rights when it did not provide him with a written summary of the contents of the undisclosed information after the court had reviewed that information *in camera*.

3.      Whether the Governor violated APRA when he withheld from disclosure a legal memorandum, referred to by the parties as a "white paper," created by a Texas deputy solicitor general concerning the proposed Texas litigation and disseminated to governors' offices in Indiana and numerous other states.

4.      Whether the Governor violated APRA when he partially redacted invoices from a private law firm he had hired to represent Indiana in the Texas lawsuit and on Groth's complaint.

[4]     We hold that, on these facts, *Citizens Action Coalition* does not apply to the request for public records directed to the Governor. We also hold that the trial court did not violate Groth's due process rights. And we affirm on the merits of the Governor's decisions to withhold the white paper from public disclosure and to partially redact the invoices. The white paper contains legal theories in contemplation of litigation, was used by the Governor in his decision to join the litigation, and is exactly the type of record that may be excluded from public access under APRA. Similarly, the Governor's redactions from the legal invoices were within his discretion under APRA.

# Facts and Procedural History[1]

On December 10, 2014, Groth submitted a written request to the Governor's office for documents relating to the Governor's decision to join the State of Texas in a federal lawsuit against the President of the United States with respect to certain recent presidential executive orders on immigration. According to Groth's request:

> Pursuant to [APRA], I am hereby requesting public records that your office maintains concerning your discretionary decision to hire outside counsel at Barnes & Thornburg [LLP] to represent your office and/or the State of Indiana in litigation encaptioned *State of Texas, et al[.] v. United States of America*, pending in the United States District Court for the Southern District of Texas, Brownsville Division, challenging the November 20, 2014, action of the President of the United States to exercise discretion with respect to certain individuals who came to the United States as children and whose parents are United States citizens or permanent residents. More specifically, I am requesting the following records pertaining to said lawsuit: (1) all correspondence between your office and the office of the Indiana Attorney General, any other state official, any governmental official from another state, or any private entity, with respect [to] your decision to become a party in [the] litigation; (2) the contract or agreement between your office and Barnes & Thornburg LLP, retaining that firm to represent you and/or the State of Indiana in said lawsuit; (3) any and all invoices from

---

[1] We held oral argument on November 21, 2016, in the Indiana Supreme Court courtroom. At that argument, counsel for Groth suggested that the Governor had partially redacted multiple emails he had submitted in response to the APRA request. It is clear on appeal, however, that the only issues raised regarding the Governor's alleged noncompliance with APRA relate to the law firm invoices and the "white paper," the latter of which was an attachment to an email received by the Governor. The email to which the white paper was attached was released in full and is reproduced in material part below.

Barnes & Thornburg for professional services rendered or to be rendered in connection with said lawsuit; and (4) evidence of any payments made to Barnes & Thornburg for professional services rendered in connection with said lawsuit.

Appellant's App. Vol. 2 at 12.

[6] The Governor responded to Groth's request with more than fifty pages of documents.[2] The Governor redacted portions of several of those documents, and he declined to release the white paper, a legal memorandum. For example, part of the Governor's response for invoices from Barnes & Thornburg LLP described the attorneys' work as follows:

> Worked on litigation, including review of district court filing notices and update reports from Texas counsel, and work on documenting potential damages to State.
>
> [Redacted] conferred with Angela Colmenero, assistant Attorney General in Texas, regarding declaration to support standing arguments; reviewed material forwarded by Ms. Colmenero; [redacted] began work on draft declaration.
>
> Worked on litigation, including review of district court filing notices.
>
> Reviewed amicus brief filed by various immigrant groups; communicated with Allison Karns about the amicus briefs; reviewed various draft declarations from Texas and Wisconsin

---

[2] Groth has included only eighteen pages of those documents in his appendix on appeal. Groth has also omitted from his appendix the Governor's response to Groth's complaint to the Public Access Counselor. And the Governor did not file an Appellee's Appendix.

representatives; [redacted] communicated with Angela Carmenero regarding declarations; communicated with Andy Oldham regarding hearing; [redacted].

*Id.* at 22. The invoices also described, without redactions, the dates of the services rendered, the names of the attorneys providing the services, the hours the attorneys logged for the services rendered, and the total invoice amounts.

[7] Another document submitted by the Governor in response to Groth's request was an unredacted email from Daniel Hodge, the chief of staff to then Texas Governor-Elect Greg Abbott, dated November 25, 2014. The subject of Hodge's email was "Legal Challenge to President's Executive Orders," and Hodge addressed his email to the "Chiefs of Staff" of governors in several different states.[3] *Id.* at 30. According to Hodge:

> I am Texas Governor-Elect Greg Abbott's Chief of Staff and am contacting you *to follow-up on comments my boss made during the Governors-Only meeting last week.* As some of you may have heard, the State of Texas is preparing a legal challenge to the President's recent executive orders on immigration. *During last week's meeting, Governor-Elect Abbott promised that we would circulate a white paper outlining the legal theories supporting the State's legal challenge to the other Governors. A copy of that white paper is attached to this email.*

---

[3] Hodge sent the email to thirty different recipients, some of whom had state-based email addresses and some of whom did not. The recipients with clearly identifiable state-based email addresses were in the following twenty-six states: Alabama, Alaska, Arizona, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Wisconsin, and Wyoming.

Our hope is that other states will join the State of Texas' legal action so that we will have a broad coalition to challenge the President's action—just as we did when 26 states banded together to challenge ObamaCare. Because Gov-Elect Abbott currently serves as Attorney General of Texas, we have also contacted many of your Attorneys General to inquire about their interest in joining Texas' legal challenge. Those offices have also been provided a copy of the attached white paper.

However, because some Governors indicated last week that their Attorneys General may not elect to join our legal challenge, Gov-Elect Abbott asked that I share this white paper with your office[s] so that Governors whose AGs decline to join the case may do so on behalf of their states. Deputy Solicitor General Andy Oldham is lead counsel for this matter and the drafter of the attached white paper. . . .

*Id.* (emphases added). Although Hodge attached the white paper to his email, Governor Pence withheld release of that document in his response to Groth's APRA request.

[8] Groth complained about the Governor's response to Indiana's Public Access Counsel.[4] According to Groth, the Governor's response failed to comply with APRA. The Public Access Counselor disagreed, stating:

---

[4] The Public Access Counselor is appointed by the Governor. I.C. § 5-14-4-6. The Public Access Counselor has the authority, among other things, to provide guidance to public agencies and officials regarding Indiana's public access laws. I.C. § 5-14-4-10. This authority includes the power "[t]o issue advisory opinions to interpret public access laws . . . ." *Id.* Advisory opinions, by definition, are "nonbinding statements." *Black's Law Dictionary* 1265 (10th ed. 2014).

Our General Assembly created the Public Access Counselor position to provide parties with efficient—but, correspondingly, nonbinding—advice regarding compliance with Indiana's public access laws. In light of that purpose, a party "is not required to file a complaint" with the Public Access Counselor "before filing an

> The Governor's Office has provided a proper response . . . as to why parts of the document were redacted. Pursuant to Ind. Code §§ 5-14-3-4(b)(2) and (6), the materials redacted may contain attorney work product and deliberative materials between inter-agency personnel and its designated contractor. Additionally, under Ind. Code § 34-46-3-1, the records may have been excluded because they include attorney-client communication. The redaction of legal invoices for this purpose is not unusual and has been addressed as appropriate in several prior Public Access Counselor Opinions.
>
> Pursuant to Ind. Code § 5-14-3-6, redactions should be made with precision so non-disclosable records are separated from disclosable material. The redactions made to the records you have presented do not appear on their face to be overly redacted, relative to other attorney invoices this Office has seen.

Public Access Counselor, *Re: Formal Complaint 15-FC-133; Alleged Violation of the Access to Public Records Act by the Office of Governor Mike Pence* (May 27, 2015), http://in.gov/pac/advisory/files/15-FC-133.pdf. The Public Access Counselor then concluded that the Governor "did not violate the Access to Public Records Act." *Id.*

[9] Groth then filed his complaint in the Marion Superior Court. The trial court reviewed the unredacted invoices and previously undisclosed white paper *in*

---

action" in the trial court for an alleged violation of Indiana's public access laws. I.C. § 5-14-5-4. As such, when a complaint is filed in a trial court *after* the Public Access Counselor has rendered an advisory opinion on the matter, the court may find the Public Access Counselor's opinion persuasive but the court owes no deference to that opinion.

*camera* and concluded, after a hearing, that the Governor had complied with APRA. This appeal ensued.[5]

# Discussion and Decision

## *Standard of Review*

[10] Groth appeals the trial court's judgment for the Governor. Under the Indiana Code, the trial court's review of Groth's complaint for an alleged APRA violation was *de novo*, or without deference to the public agency[6] that denied the access, and the initial burden of proof in the trial court was on the agency. I.C. § 5-14-3-9(f), (g)(1). The public agency meets its burden of proof by showing that the undisclosed records fall within an exception listed under Indiana Code Section 5-14-3-4 and by establishing the content of those records with adequate specificity beyond merely relying on a conclusory statement or affidavit. I.C. § 5-14-3-9(f), (g). If the undisclosed records fall within a mandatory exception listed under Indiana Code Section 5-14-3-4(a), as a matter of law the records shall not be disclosed. If the undisclosed records fall within a discretionary exception listed under Indiana Code Section 5-14-3-4(b), it is in the agency's discretion not to disclose the records. Once the agency has met its initial

---

[5] The federal litigation that is the subject of Groth's APRA complaint has already made its way through a United States District Court and United States Court of Appeals to the United States Supreme Court and been remanded to the district court while we are only now addressing the APRA complaint. *See United States v. Texas*, 136 S. Ct. 2271 (2016). Nonetheless, the complaint here raises a viable question that has not been obviated in the least by the legal proceedings in the federal forum.

[6] The Governor and his staff constitute a public agency under APRA. *See* I.C. § 5-14-3-2(n)(1). Also, we note that the 2016 version of Indiana Code Section 5-14-3-2 consists of two irreconcilable versions. But, as noted in paragraph 1, our citations to the Indiana Code are as it existed at the time Groth made his APRA request to the Governor at the end of 2014.

burden of proof to show that undisclosed records fall within a discretionary exception under Section 4(b), the burden shifts to the complaining party to demonstrate that the agency's denial of his access to those records was "arbitrary and capricious." I.C. § 5-14-3-9(g).

[11]    Because the trial court's review of the agency action was, as a matter of law, *de novo*, and because the only evidence presented to the trial court here were paper records, we are in just as good a position on appeal as the trial court was to consider the merits of Groth's complaint. Accordingly, our review of the trial court's judgment is *de novo*. *E.g.*, *Anderson v. Wayne Post 64, Am. Legion Corp.*, 4 N.E.3d 1200, 1206 (Ind. Ct. App. 2014), *trans. denied*. We disagree with the Governor's argument on appeal that we must defer to the trial court's assessment of the meaning of paper records when that assessment follows from an *in camera* review. *Cf. id.* (holding that we review a paper record *de novo*).

[12]    The Governor also asserts that we have no authority to conduct our own *in camera* review of sealed documents. Again, we disagree. Among other reasons, Article 7, Section 6 of the Indiana Constitution guarantees the right to one appeal. The Governor's argument would render that right illusory where, as here, the merits of an appeal turn wholly on documents reviewed *in camera* by a trial court. On appeal, we review the entire trial court record. Groth has requested *in camera* review on appeal of the documents at issue, and to give effect to his right to an appeal, we have, by separate order, granted his request. However, we agree with the Governor that those documents shall remain

excluded from public access pursuant to Indiana Appellate Rule 23(F)(2) and Indiana Administrative Rule 9(G).

### Issue One:  Justiciability of APRA Requests to the Governor

[13]     We first consider the Governor's argument on appeal that Groth's APRA complaint is not justiciable.  As the Indiana Supreme Court has explained:

> justiciability is not a question of jurisdiction, but whether it is prudent for the Court to exercise its jurisdiction. . . .
>
> The Indiana Constitution explicitly provides for the separation of powers:  "The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."  Article 3, § 1.  "[A]lthough the courts have jurisdiction to review [a] case in the first instance, justiciability concerns stemming from Article 3, Section 1, caution courts to intervene only where doing so would not upset the balance of the separation of powers."  *Berry [v. Crawford]*, 990 N.E.2d [410,]  418 [(Ind. 2013)].  In other words, although this Court may have subject matter jurisdiction, it may, "for prudential reasons," ultimately conclude that the issue presented is non-justiciable.  *Id.* "[W]here a particular function has been expressly delegated to the legislature by our Constitution without any express constitutional limitation or qualification, disputes arising in the exercise of such functions are inappropriate for judicial resolution."  *Id.* at 421.

*Citizens Action Coalition*, 51 N.E.3d at 240-41.

[14] The Governor asserts that *Citizens Action Coalition* applies here. In that case, the Indiana Supreme Court considered whether the legislative "work product" exception to APRA's disclosure rules was justiciable. Specifically, in *Citizens Action Coalition* the plaintiffs requested correspondence that Eric Koch, a member of the Indiana House of Representatives, or his staff had sent to or received from business organizations with respect to specific legislation. Acting on Representative Koch's behalf, the Indiana House Republican Caucus denied the requests because, in relevant part, APRA expressly "except[s]" from disclosure "at the discretion of a public agency" the "work product of individual members and the partisan staffs of the general assembly." I.C. § 5-14-3-4(b)(14).

[15] The Indiana Supreme Court held that it would not be prudent for an Indiana court to define the "work product" of a member of the General Assembly or his partisan staff under Section 4(b)(14), and, therefore, it dismissed the appeal as not justiciable. *Citizens Action Coalition*, 51 N.E.3d at 241-43. Specifically, the court stated:

> To maintain the separation of powers, this Court "should not intermeddle with the internal functions of either the Executive or Legislative branches of Government." *[State ex rel.] Masariu [v. Marion Sup. Ct. No. 1]*, 621 N.E.2d [1097,] 1098 [(Ind. 1993)[7]].

---

[7] The Governor also relies on *Masariu*, which is inapposite. In *Masariu*, the Indiana Supreme Court held that voting records of the Indiana House of Representatives were not subject to APRA or Indiana's Open Door Law because neither of those statutes "empower[s] the judicial branch to inquire into and interfere with the internal operations of the" House. 621 N.E.2d at 1098. More specifically, the court held that the power of the judiciary "cannot be authorized to undermine the exclusive constitutional authority of the presiding

This Court has previously found a separation of powers issue where legislation appears to empower the judicial branch to "inquire into and interfere with the internal operations of the Indiana House of Representatives." *Id.* We determine that a similar type of inquiry and interference with the internal operations of the legislative branch is being requested in the present case.

APRA provides that "[a]ny person may inspect and copy the public records of any public agency during the regular business hours of the agency, except as provided in section 4 of this chapter." Ind. Code § 5-14-3-3(a). . . .

\* \* \*

The determinative issue in relation to justiciability arises instead under Defendants' assertion that even if APRA is applicable, the requested documents are exempt from disclosure under APRA. As stated above, Indiana Code section 5-14-3-4(b) provides in pertinent part that "the following public records shall be excepted from section 3 of this chapter at the discretion of a public agency . . . The work product of individual members and partisan staff of the general assembly." *The term "work product" is not defined within APRA nor by rule. Thus, the question becomes whether, under the principles of justiciability, this Court should define legislative "work product" and order the legislature to disclose records in accordance with this court-created definition. This we will not do.*

\* \* \*

---

offices of each house to authenticate all legislation." *Id.* The records requested of the Governor here are not analogous to the voting records of the members of the Indiana House of Representatives.

Under Article 4, Section 16 of the Indiana Constitution, "[e]ach House shall have all powers, necessary for a branch of the Legislative department of a free and independent State." The General Assembly itself carries out those powers delegated to the legislative branch under Article 4, Section 16. Consequently, only the General Assembly can properly define what work product may be produced while engaging in its constitutionally provided duties. Thus, defining work product falls squarely within a "core legislative function." Moreover, the General Assembly exercised its constitutional law-making authority when it crafted Section 4(b) of APRA, which provides that legislative work product "shall be excepted . . . *at the discretion of a public agency.*" Ind. Code § 5-14-3-4(b) (emphasis added). Since the General Assembly and its members constitute a "public agency," the statute itself expressly reserves to the General Assembly the discretion to disclose or not to disclose its work product. We are not inclined to make determinations that may interfere with the General Assembly's exercise of discretion under APRA.

We hold that determining whether the documents requested by Plaintiffs are excepted under APRA as legislative work product presents a non-justiciable question.

*Id.* at 241-43 (emphasis added; footnote omitted; some alterations original).

[16]   Relying on *Citizens Action Coalition*, the Governor asserts as follows:

The question of whether Groth's specific APRA requests at issue are exempt from disclosure is not justiciable. Judicial inquiry into what documents the Governor chose to withhold from Groth in responding to his specific requests about Indiana's challenge to President Obama's actions constitute intermeddling with the internal functions of the executive branch . . . .

\* \* \*

> Groth's requests seek inquiry into core executive functions reserved to the Governor . . . .
>
> . . . Groth now seeks judicial enforcement of his APRA requests, asking that the judicial branch interfere with these core functions expressly delegated to the Governor.

Appellee's Br. at 30-31. Thus, the Governor contends that his "own determinations" under APRA are conclusive and that it would violate the separation of powers doctrine for the judiciary to "second guess" those determinations. *Id*. at 32-33. We cannot agree.

[17] This case is not a challenge to the Governor's core executive functions or his constitutional authority as chief executive to decide whether Indiana should join Texas and other states as a plaintiff in a federal suit against the President. Rather, the APRA requests here are merely requests for access to public records that concern a matter of legitimate public interest. On the issue of justiciability, the Governor does not assert a particular statutory exemption from APRA but, rather, makes a categorical claim of executive privilege from disclosure of his public records under APRA. The Governor's argument would, in effect, render APRA meaningless as applied to him and his staff. APRA does not provide for any such absolute privilege, and the separation of powers doctrine does not require it. We reject the Governor's assertion that his "own determinations" regarding whether to disclose public records are not subject to judicial review. *See id.*

[18]     Moreover, *Citizens Action Coalition* does not apply to APRA requests to the Governor for several additional reasons. First, the statutory exception at issue in *Citizens Action Coalition* applies only to the General Assembly. *See* I.C. § 5-14-3-4(b)(14). The Governor, obviously, did not rely on and could not have relied on that provision in making his response to Groth's APRA request. Second, there is no statutory exception within APRA that is a "Governor's version" of Section 4(b)(14). That is, there is no statutory counterpart to the legislative work product exception that applies to the Governor or his staff. *See generally* I.C. § 5-14-3-4(a), (b). Thus, there is no APRA exception on which the Governor could rely that might plausibly be captured by the holding in *Citizens Action Coalition*. Indeed, at oral argument, counsel for the Governor acknowledged that there is no text to be found in APRA that exempts the Governor from an APRA request.

[19]     The exceptions relied on by the Governor in his response to Groth relate to privileged attorney-client communications, attorney-client work product, and deliberative material. *See* I.C. § 5-14-3-4(a)(1), (a)(8), (b)(2), and (b)(6). To determine the meaning and apply those exceptions to an APRA request does not interfere with a core executive function. When APRA is correctly administered, the Governor's prerogatives as the State's chief executive remain intact.

[20]     Unlike the legislative work product exception at issue in *Citizens Action Coalition*, the interpretation and application of the provisions at issue here do not present novel legal questions. *See Citizens Action Coalition*, 51 N.E.3d at 242. Indiana

case law readily defines privileged attorney communications. *E.g.*, *Corll v. Edward D. Jones & Co.*, 646 N.E.2d 721, 724 (Ind. Ct. App. 1995). APRA expressly defines "[w]ork product of an attorney," as used in Section 4(b)(2). I.C. § 5-14-3-2(r). And our courts have already defined and applied the term "deliberative material" as used in Section 4(b)(6). *E.g.*, *An Unincorporated Operating Div. of Ind. Newspapers, Inc. v. The Trustees of Ind. Univ.*, 787 N.E.2d 893, 909-15 (Ind. Ct. App. 2003), *trans. denied*.

[21]   The Governor asks that we disregard those definitions in APRA and our case law and, instead, apply *Citizens Action Coalition* to him and his staff, abstain from considering the questions presented in this appeal on the merits, and hold that "Groth does not present a justiciable issue." Appellee's Br. at 33. Again, in *Citizens Action Coalition*, on prudential grounds the Indiana Supreme Court invoked the separation of powers doctrine when it declined to impose a "court-created definition" of the "work product of the individual members and the partisan staffs of the general assembly." 51 N.E.3d at 242. The court concluded that Section 4(b) of APRA "expressly reserves to the General Assembly the discretion to disclose or not to disclose its work product." *Id.* But the court also held that APRA does apply to the General Assembly and its members. *Id.* And the court did not hold that a person's APRA requests to a co-equal branch of government are not justiciable. Thus, we conclude that *Citizens Action Coalition*, which concerns a provision that applies only to the legislature, does not apply to the Governor and his staff and that the separation of powers doctrine does not require that we abstain from deciding this appeal

on the merits. The questions presented in this appeal are justiciable, and to determine the answers to those questions we need only apply APRA to the facts.

### Issue Two: Due Process

[22] We next consider Groth's argument on appeal that the trial court's refusal to provide a summary of the undisclosed information, after the court had reviewed that information *in camera*, denied him his right to due process. In particular, Groth asserts that his opportunity to meet his burden to demonstrate that the Governor had failed to comply with APRA "is necessarily hampered by his inability to see what the particular item is." Appellant's Br. at 18-19. In light of that concern, Groth requested that the trial court, following its *in camera* review, describe "the general nature of the information with enough specificity to alert the parties to what type of information is redacted" so that Groth could "make arguments [regarding] whether that type of information is required to be disclosed under the public records laws." Appellant's App. Vol. 2 at 32.

[23] We agree with the Governor that Groth's due process rights were not implicated by the trial court's judgment.[8] The Indiana Supreme Court has considered and rejected a claim similar to Groth's before. Specifically, the Indiana Supreme Court has stated as follows:

---

[8] The Governor also asserts that "the alleged violation of state law cannot form the basis of a due process claim." Appellee's Br. at 28. But Groth does not assert that the trial court violated state law; Groth asserts that the trial court did not fully protect his due process rights.

As for the State's claim that it has not been afforded the opportunity to review the privileged documents to determine if they contain non-privileged information, we conclude the State is not entitled to review the documents. And this is so because the very nature of the psychologist/patient privilege precludes the State from gaining access to confidential communications absent an exception. Rather, a determination must be made in the first instance as to whether the State has a right of access to the documents. Allowing the State itself to review the documents in order to make that determination would eviscerate the reason the privilege exists in the first place, namely: to protect confidential communications between psychologists and patients.

In essence we entrust trial courts rather than sparring litigants with the authority to preserve the inviolability of privileged information. And although the trial court may have allowed the State to review the requested documents in this case under a confidential protective order, it was not compelled to do so. Further, the notion of a trial court conducting an *in camera* inspection of documents to determine whether information contained in them is or is not discoverable is not particularly remarkable. For example in *Owen v. Owen*, 563 N.E.2d 605 (Ind. 1990), we addressed the physician/patient privilege declaring:

> [I]n those rare cases where the physician-patient privilege is properly invoked, it is incumbent on the party seeking to assert the privilege to identify to the court specifically which documents are believed to remain within the privilege, after which the court will review the contested documents *in camera* to ascertain their entitlement to the protection of the privilege.

*Id.* at 608 (emphasis added). In sum, the State has not shown any entitlement to review the contested documents, and the trial

court did not abuse its discretion by conducting the *in camera* inspection.

*State v. Pelley*, 828 N.E.2d 915, 920-21 (Ind. 2005) (some citations omitted).

[24] In other words, *Pelley* rejects an argument similar to Groth's and holds that the purpose of *in camera* review is for the court to determine independently whether certain information should be disclosed to an opposing party. *Id.* Groth could have requested the trial court to permit him to view the sealed records under a confidential protective order, which the trial court in its discretion may or may not have allowed, *see id.* at 921, but he did not make such a request. He cannot avoid his forfeiture of that opportunity by claiming a due process violation. The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Groth has not shown that he did not have an opportunity to be heard at a meaningful time and in a meaningful manner. Accordingly, we reject Groth's argument that the trial court's judgment violated his due process rights.

### Issue Three: White Paper

[25] We now turn to the substance of the Governor's APRA decisions. We first consider whether the Governor properly withheld disclosure of the white paper that was attached to the email from Hodge, the chief of staff to the Governor-Elect of Texas, which Hodge sent to Governor Pence's office and to numerous other governors' offices throughout the United States. The Governor withheld

this document under Indiana Code Sections 5-14-3-4(a)(1) and (a)(8), as a privileged attorney-client communication; Indiana Code Section 5-14-3-4(b)(2), as attorney work product; and Indiana Code Section 5-14-3-4(b)(6), as deliberative material. We agree with the Governor that the white paper was a privileged attorney-client communication and, also, that the Governor acted within his discretion when he withheld the white paper as deliberative material.[9]

[26]  Pursuant to APRA, "[t]he following public records are excepted from section 3 of this chapter and *may not be disclosed* . . . : (1) Those declared confidential by state statute. . . . (8) Those declared confidential by or under rules adopted by the supreme court of Indiana." I.C. § 3-14-3-4(a) (emphasis added). Communications that fall within the attorney-client privilege are confidential under state law and the rules of the Indiana Supreme Court. As then-Chief Justice Shepard explained:

> the rationale underlying the attorney-client privilege supports its application to state agencies and their attorneys. The privilege protects those in need of legal services by providing for complete and confidential information to an attorney so the attorney may be fully advised in serving the client while assuring the client that these confidences will not be revealed. *Colman v. Heidenreich* (1978), 269 Ind. 419, 381 N.E.2d 866. A state agency has the same need for confidential legal advice.

---

[9] We need not discuss whether the attorney work product exception under Indiana Code Section 5-14-3-4(b)(2) applies to the white paper.

* * *

This privilege is not defeated by the requirement of open public records. Generally, any person may inspect the public records of any public agency. Ind. Code § 5-14-3-3(a) (Burns 1987 Repl.). The legislature has created an exception to this rule for records declared confidential by statute or by Supreme Court rule. Ind. Code § 5-14-3-4(a)(1), (8). Privileged communications between attorney and client are protected by both. Ind. Code § 34-1-14-5 [now I.C. § 34-46-3-1] renders attorneys incompetent to testify as to confidential communications made to them in the course of their professional business. This statute is the codification of the attorney-client privilege. *Key v. State* (1956), 235 Ind. 172, 132 N.E.2d 143 (construing the predecessor statute, § 2-1714 (Burns 1946 Repl.)). An attorney also has a statutory duty to preserve the confidences and secrets of his client. Ind. Code § 34-1-60-4 [now I.C. § 33-43-1-3(5)]. This is a further codification of the privilege. *Colman*, 269 Ind. at 422, 381 N.E.2d at 868. Additionally, privileged communications are excluded from discovery by Trial Rule 26(B)(1), Ind. Rules of Procedure. Thus, a privileged communication between attorney and client is exempt from public inspection because it is declared confidential by statute and Supreme Court rule.

When a client seeks advice from an attorney in his professional capacity, the communication between attorney and client within the scope of the professional relationship should be treated as strictly confidential. This privilege applies to all communications made to an attorney for the purpose of professional advice or aid, regardless of any pending or expected litigation. *Colman*, 269 Ind. at 423, 381 N.E.2d at 869.

*Ind. State Highway Comm'n v. Morris*, 528 N.E.2d 468, 474-75 (Ind. 1988)

(Shepard, C.J., concurring) (footnote omitted).

[27]     The attorney-client privilege "applies to all communications between the client and his attorney for the purpose of obtaining legal advice or aid regarding the client's rights and liabilities." *Corll*, 646 N.E.2d at 724. A person asserting the privilege must show that "(1) an attorney-client relationship existed and (2) a confidential communication was involved." *Id.* "Minimally, meeting this burden entails establishing that 'the communication at issue occurred in the course of an effort to obtain legal advice or aid, on the subject of the client's rights or liabilities, from a professional legal advisor acting in his or her capacity as such.'" *TP Orthodontics, Inc. v. Kesling*, 15 N.E.3d 985, 995-96 (Ind. 2014) (quoting *Mayberry v. State*, 670 N.E.2d 1262, 1266 (Ind. 1996)). Again, the Governor carried the initial burden in the trial court to show that the white paper fell within the attorney-client privilege and was, therefore, not subject to disclosure pursuant to Section 4(a). I.C. § 5-14-3-9(f).

[28]     The white paper is a privileged attorney-client communication and is protected by the common interest privilege. As we have explained:

> The common interest privilege is an extension of the attorney-client privilege. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). *In effect, the common interest privilege extends the attorney-client privilege to otherwise nonconfidential communications between parties represented by separate attorneys*. *Id.* The common interest privilege "treats all involved attorneys and clients as a single attorney-client unit, at least insofar as a common interest is pursued." 2 Stephen A. Saltzberg, *et al.*, Federal Rules of Evidence Manual 501-30 (10th ed. 2011). *The privilege is an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party*. *BDO*

> *Seidman*, 492 F.3d at 815; *see Cavallaro v. United States*, 284 F.3d 236, 250 (1st Cir. 2002).

> *The common interest privilege permits parties whose legal interests coincide to share privileged materials with one another in order to more effectively prosecute or defend their claims.* Hunton & Williams v. U.S. Dep't of Justice, 590 F.3d 272, 277 (4th Cir. 2010).* The privilege has been recognized in cases for over a century. *United States v. McPartlin*, 595 F.2d 1321, 1336 (7th Cir. 1979). It applies in civil and criminal litigation, and even in purely transactional contexts. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 364 (3rd Cir. 2007).

> The privilege is limited to those communications made to further an ongoing joint enterprise with respect to a common legal interest. *BDO Seidman*, 492 F.3d at 816; *see Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir. 1965) (statements to and among attorneys "should be privileged to the extent that they concern common issues and are intended to facilitate representation in possible subsequent proceedings"). It is fundamental that the privilege cannot be waived without the consent of all parties to the defense. *John Morrell & Co. v. Local Union 304A of United Food & Commercial Workers*, 913 F.2d 544, 556 (8th Cir. 1990).

*Price v. Charles Brown Charitable Remainder Unitrust Trust*, 27 N.E.3d 1168, 1173 (Ind. Ct. App. 2015) (emphases added), *trans. denied*.

[29] In *Corll*, we held that the common interest privilege applied to attorneys' communications to prospective co-plaintiffs. 646 N.E.2d at 724-25. As we stated:

> there is no question that the purpose of each preliminary meeting [between plaintiffs' attorneys and prospective co-plaintiffs] was to

discuss a potential lawsuit. . . . Where, as here, a group of individuals meet with attorneys concerning potential litigation, and the purpose of that consultation is to provide legal advice regarding rights and liabilities, we conclude that any communications made in furtherance of that purpose are "confidential communications" between attorney and client and carry with them an expectation of confidentiality.

*Id.* We further noted:

> Whether or not any one [prospective client] had retained any of the attorneys prior to a specific meeting is of no consequence. . . . [T]he preliminary nature of the meetings does not remove the meetings from the scope of the attorney-client privilege. What is essential to the existence of the attorney-client privilege is the confidential relation of client and attorney, and not the pendency of litigation or payment of a fee.

*Id.* at 725 n.4. Thus, we concluded that, "[w]hen two or more persons, with a common interest in some legal problem, jointly consult an attorney, 'their confidential communications with the attorney, though known to each other, will of course be privileged in a controversy of either or both the clients with the outside world.'" *Id.* at 725 (quoting *McCormick on Evidence* § 91 (4th ed. 1992)).

[30] As Hodge's email explains, the white paper was drafted by a Texas deputy solicitor general on behalf of the State of Texas. Thereafter, Hodge circulated the white paper as a "follow-up" to a "Governors-Only meeting" in which the Governor-Elect of Texas had discussed with other governors that his state was "preparing a legal challenge to the President's recent executive orders on immigration." Appellant's App. Vol. 2 at 30. The Governor-Elect of Texas

had discussed the proposed litigation with the other governors on the "hope . . . that other states will join the State of Texas' legal action . . . ." *Id.* And the attached white paper "outlin[ed] the legal theories supporting [Texas'] legal challenge . . . ." *Id.*

[31] Moreover, in another email disclosed by the Governor in response to Groth's complaint, a reporter asked the Governor's office "to follow up on the [G]overnor's statement[10] about President Obama's executive order on immigration." *Id.* at 25. The reporter also asked if Governor Pence agreed with "some governors" in other states that the President's order would "pose operational challenges for states, including whether to issue driver's licenses to immigrants or grant in-state tuition." *Id.* The reporter's email to the Governor's office was sent three days prior to Hodge's email with the white paper attachment.

[32] Governor Pence met his burden to show that the white paper was not subject to disclosure under APRA. There is no question that the Governor was aware of and disagreed with the President's immigration orders. And, based on Hodge's

---

[10] The reporter's inquiry was in response to a press release issued by the Governor. We take judicial notice that, in that press release, Governor Pence expressed his disagreement with the President's immigration decisions. *Governor Pence Calls President's Executive Order 'End Run Around Democratic Process'* (Nov. 20, 2014), http://www.in.gov/activecalendar/EventList.aspx?fromdate=11/20/2014&todate=11/20/2014&display=Day&type=public&eventidn=195043&view=EventDetails&information_id=208023; *see also* Ind. Evidence Rule 201(a), (d) (providing for judicial notice); *Troyer v. Troyer*, 987 N.E.2d 1130, 1138 n.3 (Ind. Ct. App. 2013) (noting that judicial notice may be taken on appeal), *trans. denied*. Indeed, the Governor's press release preceded Hodge's email by five days, and, in that press release, the Governor stated that "[t]he State of Indiana will carefully evaluate the details of the Executive Order and take any available legal actions necessary to restore the rule of law and proper balance to our constitutional system of government." *Governor Pence Calls President's Executive Order 'End Run Around Democratic Process'*, *supra*.

email to the Governor's Chief of Staff, Jim Atterholt, the Governor was aware of the Governor's-only meeting; he was aware that the State of Texas intended to "lead the charge" against the President's orders in a federal lawsuit; he was aware that the State of Texas sought to collaborate with other states to prosecute that legal challenge; and he recognized that the white paper had been distributed to assist likely co-plaintiffs in their decision whether to join the contemplated litigation. Further, it is clear that the white paper was created by a Texas deputy solicitor general on behalf of his client, the State of Texas. And, having reviewed the white paper *in camera*, we agree with the Governor that it is devoted to a discussion of legal theory and strategy to be used in the federal lawsuit.

[33] Thus, we agree with the Governor that, "[i]n the case of the white paper, one party is sharing a legal memo, drafted by its lead counsel, with other potential parties in order to assist those parties in determining whether to join in the lawsuit." *Id.* at 65. As such, the white paper was a communication made to further an ongoing joint enterprise with respect to a common legal interest. *Price*, 27 N.E.3d at 1173. Accordingly, we hold that the white paper was privileged attorney-client communication under the common interest doctrine. *See Corll*, 646 N.E.2d at 724-25. As promised by Texas Governor-Elect Abbott, Hodge sent the white paper to Governor Pence and other governors to explore their common interest in contesting the President's executive orders. This communication of a legal opinion occurred as Texas sought to determine

whether other states would agree to join in the federal suit and, as a result, twenty-five states joined Texas as plaintiffs.[11]

[34] Here, similar to *Corll*, a group of like-minded governors shared legal theories and strategies via email to consider whether to join in litigation. 646 N.E.2d at 724-25. The purpose of that consultation was to provide legal advice to the prospective co-plaintiffs. *See id.* Thus, the communications made in furtherance of that purpose were confidential communications between attorney and clients and "carr[ied] with them an expectation of confidentiality." *Id.* As such, we conclude that the Governor met his burden to demonstrate that the white paper was a privileged communication and therefore exempt from disclosure under APRA. *See* I.C. § 5-14-3-4(a)(1), (8).

[35] Nonetheless, Groth contends that the attorney-client privilege does not apply to the white paper for two reasons.[12] First, Groth asserts that, at the time the Texas deputy solicitor general created the white paper, the State of Indiana was not his client. In other words, he characterizes the white paper as an "unsolicited email" or, stated another way, an uninvited solicitation from Texas' lawyers. Reply Br. at 10. But no one suggests that the Governor would

---

[11] For the same reasons, the Governor asserts that the white paper is privileged attorney work product not subject to discovery pursuant to Indiana Trial Rule 26(B).

[12] Groth also asserts that, insofar as the white paper might contain factual recitations in addition to privileged information, those recitations are subject to disclosure. Having reviewed the white paper *in camera*, we agree with the trial court that no part of it is subject to disclosure. The facts mentioned in the white paper are facts counsel considered significant and integral to the memorandum's legal analysis and opinion and, as such, are a privileged communication.

have employed the Texas deputy solicitor general to represent the State of Indiana in the federal lawsuit. And Groth's solicitation theory is not supported by the record, which shows that the Governor and other governors knew of the President's orders and Texas' plan to contest those orders and that they anticipated receiving additional information from Texas to consider in deciding whether their states would become co-plaintiffs. The Hodge email with a legal memorandum attached was not the beginning but the continuation of a discussion already underway among the governors and, as such, was not an unsolicited email.

[36] Groth also asserts that the communication of the white paper to Governor Pence was not confidential because it was attached to an email that had been "sent to thirty recipients. The context of the [email] itself shows that the recipients were not clients of the author[] because it specifically discusses parties who may or may not have decided to join the lawsuit." *Id.* at 15. In support of that argument, Groth relies on precedent from the Fourth Circuit Court of Appeals, which provides that the common interest privilege does not apply if a public agency is "simply considering whether to become involved" in litigation. *Hunton & Williams*, 590 F.3d at 274. But that is not the Indiana rule, which recognizes that the attorney-client privilege attaches to preliminary discussions between attorneys, prospective clients, and other potential parties who share a common interest concerning a potential lawsuit. *Corll*, 646 N.E.2d at 724-25. As we explained in *Price*, the common interest privilege "is an exception to the general rule that the attorney-client privilege is waived when privileged

information is disclosed to a third party." 27 N.E.3d at 1173. Indeed, the common interest privilege expressly "permits parties whose legal interests coincide to share privileged materials . . . ." *Id.* And, again, under *Corll*, the fact that such information was shared with others who may or may not have decided to join the lawsuit does not vitiate the common interest privilege. Thus, we reject Groth's arguments.

[37] Because we hold that the Governor has met his burden to show that the white paper falls under Section 4(a) as privileged attorney-client communication, the Governor had no discretion to release the information. Rather, his nondisclosure of that document was mandatory. I.C. § 5-14-3-4(a). And we cannot agree with Groth's arguments to the contrary.

[38] We also agree with the Governor that he acted within his discretion when he withheld the white paper as deliberative material. Indiana Code Section 5-14-3-4(b)(6) permits a public agency, in its discretion, to withhold from disclosure "[r]ecords that are intra-agency or interagency advisory or deliberative material, including material developed by a private contractor under a contract with a public agency, that are expressions of opinion or are of a speculative nature, and that are communicated for the purpose of decision making." As we have explained: "The purpose of protecting such communications is to prevent injury to the quality of agency decisions. The frank discussion of legal or policy matters in writing might be inhibited if the discussion were made public, and the decisions and policies formulated might be poorer as a result."

*Unincorporated Operating Div. of Ind. Newspapers*, 787 N.E.2d at 909-10 (citations, quotations, and footnote omitted).

[39] Here, the white paper is a "paper . . . received . . . by . . . a public agency" and is therefore a record under APRA. I.C. § 5-14-3-2(o). The Governor used that record within his office, making it an intra-agency record. And the white paper was an expression of legal opinion used by the Governor for the purpose of decision making. Accordingly, the Governor acted within his discretion when he withheld the white paper under the deliberative material exception.

[40] The burden thus shifted to Groth to demonstrate that the Governor's denial was "arbitrary and capricious." I.C. § 5-14-3-9(g). "An arbitrary and capricious decision is one which is 'patently unreasonable' and is 'made without consideration of the facts and in total disregard of the circumstances and lacks any basis which might lead a reasonable person to the same conclusion.'" *A.B. v. State*, 949 N.E.2d 1204, 1217 (Ind. 2011) (quoting *City of Indianapolis v. Woods*, 703 N.E.2d 1087, 1091 (Ind. Ct. App. 1998)). We are not persuaded by Groth's argument that the Governor's response was arbitrary and capricious. *See* I.C. § 5-14-3-9(g).

[41] Thus, we affirm the trial court's judgment for the Governor with respect to the white paper.

### Issue Four: Law Firm Invoices

[42] Finally, we turn to the Governor's decision to redact the invoices of Barnes & Thornburg LLP, the private law firm the Governor had hired to represent

Indiana and his office in the Texas litigation and on Groth's APRA claim, respectively. The Governor redacted those invoices pursuant to Section 4(b)(2), which permits the Governor, "at [his] discretion," to limit his production of requested public documents when such documents are "[t]he work product of an attorney representing . . . a public agency[ or] the state . . . ."

[43] The Governor has met his burden to show that the information redacted from the legal invoices falls within the scope of Section 4(b)(2). Having reviewed the unredacted invoices *in camera*, we agree with the Governor that the redacted information refers to the attorneys' research and legal opinions, theories, communications, or conclusions with respect to various aspects of litigation involving the State and the Governor. As such, the Governor acted within his discretion when he redacted that information from the invoices as the work product of attorneys representing the State of Indiana or the Governor.

[44] The burden thus shifted to Groth to demonstrate that the Governor's denial of full access to the invoices was "arbitrary and capricious." I.C. § 5-14-3-9(g). Groth has not met that burden. Groth asserts that the Governor's decision to redact the invoices was arbitrary and capricious because the attorney work product exception does not protect either information the Governor might have shared with third parties or factual information. But Groth cites no evidence that the Governor has shared the invoices with third parties. And, having reviewed the documents *in camera*, we reject Groth's assertion that the Governor erroneously redacted information that is not attorney work product, as defined in Indiana Code Section 5-14-3-2(r). Accordingly, Groth has not met

his burden of demonstrating that the Governor's partial redaction of the legal invoices was arbitrary and capricious, and we affirm the trial court's judgment for the Governor with respect to the legal invoices.

## *Conclusion*

[45] In sum, we reject the Governor's claim that executive privilege renders his response to APRA requests immune from judicial review. We also reject Groth's argument that the trial court's judgment violated his due process rights. We affirm the trial court's judgment for the Governor on the merits of the Governor's decision to redact or withhold the records in question.

[46] Affirmed.

Baker, J., concurs.

Vaidik, C.J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

William Groth,

*Appellant-Plaintiff,*

v.

Mike Pence, as Governor of the
State of Indiana,

*Appellee-Defendant.*

Court of Appeals Case No.
49A04-1605-PL-1116

**Vaidik, Chief Judge, concurring in part and dissenting in part.**

I concur with the majority as to all issues except one. That is, I dissent from the majority's conclusion that Governor Pence has met his burden of showing that the white paper is not subject to disclosure under APRA because it is a privileged attorney-client communication pursuant to the common-interest doctrine.[13] In order for the common-interest doctrine to apply, the parties must first come to an agreement, and documents exchanged before an agreement is reached are not protected from disclosure. Here, there is no evidence in the

---

[13] The majority also finds that the white paper is protected from disclosure as deliberative material. I disagree. Indiana Code section 5-14-3-4(b)(6) permits a public agency, in its discretion, to withhold from disclosure "[r]ecords that are intra-agency or interagency advisory or deliberative material . . . that are expressions of opinion or are of a speculative nature, and that are communicated for the purpose of decision making." The majority finds that the white paper is a protected "intra-agency" record. Although the white paper was not prepared by anyone within the Governor's office, the majority, without citation to authority, finds that it qualifies as an intra-agency record because Governor Pence "used" it within his office. Slip op. at 30. I do not believe that a public agency can protect a record from disclosure as deliberative material just by "using" it.

record that Governor Pence and Texas officials reached an agreement before the white paper was emailed. As a result, I believe that the email served as a recruiting or lobbying tool by the State of Texas to encourage other states to join its legal challenge to President Obama's executive orders on immigration. Because lobbying and soliciting are not protected by the common-interest doctrine, I believe that Governor Pence has not met his burden of showing that the white paper is protected from disclosure under APRA.

[48] As our legislature recognized in the opening sentence of APRA, "A fundamental philosophy of the American constitutional form of representative government is that government is the servant of the people and not their master." Ind. Code § 5-14-3-1. Accordingly, it is the policy of this state that "all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees." *Id.* This is so because "[p]roviding persons with the information is an essential function of a representative government and an integral part of the routine duties of public officials and employees, whose duty it is to provide the information." *Id.* In short, "APRA is intended to ensure Hoosiers have broad access to most government records." *Evansville Courier & Press v. Vanderburgh Cty. Health Dep't*, 17 N.E.3d 922, 928 (Ind. 2014). APRA is liberally construed to implement this policy, with the burden for nondisclosure on the public agency denying access. I.C. § 5-14-3-1; *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1196 (Ind. 2016).

[49] Here, the majority finds that Governor Pence has met his burden of showing that the white paper is not subject to disclosure under APRA because it is a privileged attorney-client communication pursuant to the common-interest doctrine. The common-interest doctrine is an exception to the general rule that no privilege attaches to communications between a client and an attorney in the presence of a third person. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007); *Price v. Charles Brown Charitable Remainder Unitrust Tr.*, 27 N.E.3d 1168, 1173 (Ind. Ct. App. 2015), *trans. denied*. The common-interest doctrine permits parties whose legal interests coincide to share privileged materials with one another in order to more effectively prosecute or defend their claims. *Am. Mgmt. Servs., LLC v. Dep't of the Army*, 703 F.3d 724, 732 (4th Cir. 2013); *Price*, 27 N.E.3d at 1173.

[50] For the doctrine to apply, the parties must first come to an agreement. *See In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) ("[A] shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception. Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." (citation omitted)); *Hunton & Williams v. U.S. Dep't of Justice,* 590 F.3d 272, 274 (4th Cir. 2010) (explaining that it is "not enough that the agency was simply considering whether to

become involved"; rather, an agreement is required)[14]; *see also* Restatement (Third) of the Law Governing Lawyers § 75 cmt. a (Am. Law Inst. 2010) ("Whether a client-lawyer relationship exists between each client and the common lawyer is determined under § 14, **specifically whether they have expressly or impliedly agreed to common representation in which confidential information will be shared.** A co-client representation can begin with a joint approach to a lawyer or by agreement after separate representations had begun." (emphasis added)).

[51]   Timing of the agreement is important. "Documents exchanged **before** a common interest agreement is established are not protected from disclosure." *Hunton & Williams*, 590 F.3d at 285 (emphasis added). The danger in extending the common-interest doctrine to a point in time before an agreement is reached is that "mere lobbying efforts, as opposed to joint litigation strategy, will be" protected. *Id.*; *see also Am. Mgmt. Servs.*, 703 F.3d at 732 (explaining that for the common-interest doctrine to apply, there must be an agreement "**at the time** of the communications at issue" (emphasis added)); *Hunton & Williams*, 590 F.3d at 285 ("Thus, a proper assessment of the applicability of the common interest doctrine in this case requires a determination of **the point in time** when DOJ

---

[14] The majority recognizes this principle of law. *See* slip op. at 29. However, the majority, relying on *Corll v. Edward D. Jones & Co.*, 646 N.E.2d 721 (Ind. Ct. App. 1995), *trans. not sought*, finds that it is "not the Indiana rule," as Indiana recognizes that "the attorney-client privilege attaches to preliminary discussions between attorneys, prospective clients, and other potential parties who share a common interest concerning a potential lawsuit." Slip op. at 29. As explained later in my dissent, I believe that *Corll* is factually distinguishable from this case. Moreover, I believe that Indiana law requires that the communication at issue be made in pursuit of a joint strategy in accordance with some form of agreement—written or unwritten.

decided that it was in the public interest for RIM to prevail in its litigation with NTP and agreed to partner with RIM in doing so." (emphasis added)); *Price*, 27 N.E.3d at 1173 ("The privilege is limited to those communications made to further an **ongoing** joint enterprise with respect to a common legal interest." (citation omitted) (emphasis added)).

[52] Here, I believe that Governor Pence has not met his burden of showing that he had agreed to partner with Texas in its legal challenge to President Obama's executive orders on immigration when Hodge emailed the white paper to the thirty recipients (including Governor Pence's chief of staff) on November 25, 2014. The record shows that Hodge emailed the thirty recipients "to follow-up on comments my boss made during the Governors-Only meeting last week." Appellant's App. Vol. 2 p. 30. Hodge explained that "[d]uring last week's meeting, Governor-elect Abbott promised that we would circulate a white paper outlining the legal theories supporting [Texas'] legal challenge [to President Obama's recent executive orders on immigration] to the other Governors." *Id.* Contrary to the majority's implication, there is **no evidence** in the record that Governor Pence or anyone from his staff knew about, let alone attended, this meeting or that Governor Pence or anyone from his staff found out before receiving the email what was actually discussed at the meeting. *See* Oral Arg. at 23:28-23:35 (Governor Pence's attorney conceding at oral argument that there is no evidence in the record that Governor Pence attended the meeting); *see also id.* at 13:00-13:43 (Groth's attorney noting at oral argument that the record does not disclose information about the meeting). This lack of evidence is buttressed

by the email itself, which says, "**As some of you may have heard**, the State of Texas is preparing a legal challenge to the President's recent executive orders on immigration." Appellant's App. Vol. 2 p. 30 (emphasis added). There is also **no evidence** in the record that Governor Pence or anyone from his staff asked to receive, agreed to receive, or expected to receive the email. *See* Oral Arg. at 9:50-10:07 (Groth's attorney pointing out at oral argument that the record is silent as to whether Governor Pence was expecting to receive the email). In short, there is simply no evidence in the record that Governor Pence or a member of his staff communicated with Texas officials in any way about joining Texas' legal challenge to President Obama's executive orders on immigration before the white paper was emailed on November 25, 2014.[15]

[53] As such, I believe that Hodge's email served as a lobbying or soliciting tool by Texas to encourage other states to join its legal challenge. As the email itself states, "Our **hope** is that other states **will join** the State of Texas' legal action so that we will have a broad coalition to challenge the President's action . . . ." Appellant's App. Vol. 2 p. 30 (emphases added). The common-interest doctrine does not protect mere lobbying efforts but rather only joint strategy. *See Hunton*

---

[15] The majority sua sponte takes judicial notice of a press release that Governor Pence issued on November 20, 2014, five days before the white paper was emailed. In the press release, Governor Pence indicated that he disagreed with President Obama's executive orders on immigration. The press release, however, does not establish that an agreement existed between Governor Pence and Texas when the November 25, 2014, email was sent. The majority also cites as support an email that Governor Pence disclosed to Groth wherein a reporter asked Governor Pence's communications director if the governor had any comment regarding "talk among some governors" that President Obama's executive orders would pose operational challenges for the states. Appellant's App. Vol. 2 p. 25. Again, this email does not establish that Governor Pence and Texas had an agreement when the November 25, 2014, email was sent.

*& Williams*, 590 F.3d at 285.  Accordingly, I believe that the white paper, which was emailed before any sort of agreement was reached, is not protected from disclosure as a privileged attorney-client communication pursuant to the common-interest doctrine.

[54]     Furthermore, this case is easily distinguishable from *Corll v. Edward D. Jones & Co.*, 646 N.E.2d 721 (Ind. Ct. App. 1995), *trans. not sought*, which the majority heavily relies on.  In that case, several prospective plaintiffs attended a series of group meetings that were also attended by attorneys who later became the plaintiffs' counsel.  The purpose of the meeting was to gather prospective plaintiffs who had dealt with a brokerage firm's employee in order to discuss their investment losses.  We set forth the following rule:

> When two or more persons, with a common interest in some legal problem, **jointly consult** an attorney, "their confidential communications with the attorney, though known to each other, will of course be privileged in a controversy of either or both the clients with the outside world."

*Id.* at 725 (quoting *McCormick on Evidence* § 91 (4th ed. 1992) (emphasis added)); *see now McCormick on Evidence* § 91.1 (7th ed. 2013).  Unlike *Corll*, where the parties came together in pursuit of a joint strategy, here there is no evidence that Governor Pence and Texas' lawyers came together in pursuit of a joint strategy at any point before the white paper was emailed.  In the absence of such evidence, the email was a one-way solicitation designed to encourage Indiana to join Texas' legal challenge to President Obama's executive orders on immigration.

[55] The policy of APRA is to provide the public with full and complete information about the affairs of the government. Indeed, providing the public with information "is an essential function of a representative government." I.C. § 5-14-3-1. Because the record reflects that Hodge emailed the white paper to Governor Pence's chief of staff in order to lobby or solicit Indiana to join Texas' legal challenge, and before any sort of agreement between Governor Pence and Texas was reached, I believe that Governor Pence has not met his burden of showing that the white paper is protected from disclosure under APRA. I would therefore reverse the trial court on this issue and order Governor Pence to produce the white paper.