

FILED

Mar 03 2025, 8:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Jacob Adams, in his official capacity as
Director of the Indiana Department of Veterans' Affairs,

*Appellant-Defendant*

v.

Hamilton County, Indiana,

*Appellee-Plaintiff*

---

March 3, 2025

Court of Appeals Case No.
24A-PL-1384

Appeal from the Marion Superior Court

The Honorable John F. Hanley, Judge

Trial Court Cause No.
49D11-2210-PL-37195

---

**Opinion by Judge Mathias**
Judges Pyle and Foley concur.

**Mathias, Judge.**

Jacob Adams, in his official capacity as the Director of the Indiana Department of Veterans' Affairs (the "Department"), appeals the trial court's entry of summary judgment for Hamilton County on the County's complaint for declaratory judgment.[1] In its complaint, the County sought to clarify the Director's statutory obligations with respect to the supervision of County-hired Service Officers.[2] The Director raises three issues for our review,[3] which we restate as the following four issues:

> 1. Whether the County has standing under the Declaratory Judgment Act to pursue its claims against the Director.
>
> 2. Whether Indiana's judiciary should decline to exercise jurisdiction over this dispute based on alleged prudential concerns.
>
> 3. Whether the trial court misinterpreted the Indiana Code to require the Director to supervise County Service Officers.

---

[1] The County's complaint and the trial court's judgment named Dennis Wimer as the Director of the Department. During the course of this appeal, Wimer left his role as the Director, and Adams took over that role. Accordingly, Adams has been substituted as the party on appeal in accordance with Appellate Rule 17(C)(2).

[2] In their briefs, the parties refer to County Service Officers as County Veteran Service Officers, or CVSOs. We follow the statutory term "County Service Officer" in this opinion. *See* Ind. Code § 10-17-1-9 (2022).

[3] We disagree with the County's assertion that the Director has not preserved these issues for appellate review.

4. Whether the designated evidence demonstrates that the Director in fact supervises County Service Officers.

We affirm.

## Facts and Procedural History[4]

In 1945, our General Assembly established the Department "to aid and assist veterans of the armed forces of the United States entitled to benefits or advantages provided" to them by the United States, a state, or another government. Ind. Code §§ 10-17-1-1, -2(a) (2022). The Veterans' Affairs Commission (the "Commission"), in turn, "supervise[s] and control[s]" the Department. I.C. § 10-17-1-2(b)(1). And the Director "administer[s] the [D]epartment under the [C]ommission's supervision and control." I.C. § 10-17-1-2(b)(2).

The Indiana Code also directs that a county executive "shall designate and may" appoint or employ a County Service Officer (and assistants to that officer) "to serve the veterans of the county." I.C. § 10-17-1-9(a). Where "the remuneration and expenses" of an employed County Service Officer "are paid from the funds of the county," the officer shall:

---

[4] The Indiana Veterans Service Officer Association, the Disabled American Veterans of Indiana, the Veterans of Foreign Wars of Indiana, the American Legion of Indiana, and the National Guard Association of Indiana (the "Veterans' Associations") have jointly filed a brief of *amici curiae* in support of the Department. The Indiana Association of County Commissioners has filed a brief of *amicus curiae* in support of the County. We thank the participating *amici* for their thoughtful and helpful briefs.

(1) be:

> (A) an honorably discharged veteran who has at least six (6) months of active service in the armed forces of the United States; or

> (B) a service officer assistant with not less than two (2) years of experience;

(2) be a resident of Indiana or become a resident of Indiana not more than six (6) months after the service officer's start date; and

(3) *serve under the supervision of the director of veterans' affairs.*

I.C. § 10-17-1-9(c) (emphasis added). Further: "[i]f, in the judgment of the Commission," a County Service Officer

> shall have been determined to have violated any of the rules adopted by the Commission, or otherwise disqualified himself, or in the judgment of the Commission is unfit to perform the duties of his office or employment, the Commission may recommend to . . . his employer that such person be discharged from . . . employment.

915 Ind. Admin. Code 1-1-7 (2022).

[5] In December 2014, the County employed Lynn Epperson as its County Service Officer to "interview veterans" in Hamilton County and to "provide them with information and counseling, help them complete veteran benefits applications, and submit [those] applications . . . ." Appellant's App. Vol. 2, p. 85. The filing of an application for benefits "starts the clock ticking" for an "entitlement to

retroactive benefits" because it often "take[s] months or years for the United States Department of Veterans Affairs to process and approve a claim." *Id.* at 86. Thus, any delay in filing a claim "will cause a veteran or dependent to lose" some measure of available benefits. *Id.*

[6] In 2019, County officials became concerned about Epperson's performance as the County Service Officer and began to review "all open files." *Id.* at 87. In particular, the County reviewed 218 of 508 files dated between August 2018 and July 2019. Of those 218 files, 180 claims "had either been filed incorrectly or not filed at all," which put "hundreds of veterans at risk of losing their benefits." *Id.* The County terminated Epperson's employment in December 2019 and hired a new County Service Officer.

[7] In October 2022, the County filed its complaint for declaratory judgment against the Director. In particular, the County requested the trial court to declare as follows:

> a. The Director is, and at all relevant times was, responsible for supervising and evaluating [County Service Officers].
>
> b. The Director and the Department breached their statutory duties to supervise and evaluate Epperson as well as to recommend her discharge given her repeated violations of rules and her plain unfitness to perform the duties of her office or employment.

*Id.* at 23.

[8] At an ensuing deposition, the Director testified that he "did not" supervise County Service Officers with respect to their "daily activity," which he believed would have been "up to the appointing authority," *i.e.*, the hiring county. *Id.* at 77. Instead, and pursuant to other statutory directives, the Director administers Department accreditation, training, and annual recertification requirements for County Service Officers. He also administers "field direction" for the Department, which consists of managing Department properties outside of Indianapolis as well as inspections at those properties. *Id.* at 213. The Director would use district service officers, who are Department employees, to "carry out" any field direction or inspection. *Id.* Those district service officers, in turn, would coordinate with relevant County Service Officers.

[9] The Director also testified that, "for a while," he and his leadership team would conduct "site visits" with the County Service Officers. *Id.* at 214. Those site visits had a two-fold purpose: first, to show veterans in Indiana's communities that the Department does not just consist of "people behind a desk that they never see"; and, second, making sure County Service Officers had appropriate technology to meet the needs of their communities. *Id.* at 214-15. The Director also stated that his role includes helping "coordinate information" from the United States Department of Veterans Affairs and other governmental agencies to Indiana's County Service Officers. *Id.* at 216. The Director acknowledged that, if the Department received a high number of complaints coming from a particular county, he "might go in and take a look and see what's going on" there. *Id.* at 215.

Both the County and the Director moved for summary judgment. After a hearing, the court entered summary judgment for the County and denied the Director's motion for summary judgment. This appeal ensued.

## Standard of Review

The Director appeals the trial court's entry of summary judgment for the County and the court's denial of his motion for summary judgment. Our standard of review is well settled:

> When this Court reviews a grant or denial of a motion for summary judgment, we "stand in the shoes of the trial court." Summary judgment is appropriate "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." We will draw all reasonable inferences in favor of the non-moving party. We review summary judgment de novo.

*Arrendale v. Am. Imaging & MRI, LLC*, 183 N.E.3d 1064, 1067-68 (Ind. 2022) (citations omitted). Questions of law, such as those presented in this appeal, are particularly apt for summary judgment. *See, e.g.*, *Erie Indem. Co. v. Estate of Harris*, 99 N.E.3d 625, 629 (Ind. 2018). Further, the fact that the parties have filed cross-motions for summary judgment neither alters our standard of review nor changes our analysis—we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

## 1. The County has standing under the Declaratory Judgment Act to pursue its claims.

[12] We first address the Director's argument on appeal that the County lacks standing to pursue its claims under the Declaratory Judgment Act, I.C. §§ 34-14-1-1 to -16. The Declaratory Judgment Act confers on the judiciary "the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." I.C. § 34-14-1-1. The Act is "remedial" with a stated purpose "to settle and to afford relief from uncertainty and insecurity with respect to rights, status[,] and other legal relations," and it "is to be liberally construed and administered." I.C. § 34-14-1-12.

[13] Thus, the Act provides in relevant part that:

> Any person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder.

I.C. § 34-14-1-2. A county qualifies as a "person" under the Act. I.C. § 34-14-1-13.

[14] That said, the Act "does not open the courts to resolving theoretical cases; it still requires a justiciable controversy or question." *Holcomb v. City of Bloomington*, 158 N.E.3d 1250, 1256 (Ind. 2020) (quotation marks omitted). Accordingly, a declaratory-judgment plaintiff must have a "substantial *present* interest in the relief sought." *Id.* (emphasis added; quotation marks omitted). In

the context of future concerns, this means that the "'ripening seeds' of a controversy exist" at the time declaratory relief is sought. *Id.*

[15] But it is in the context of past concerns that the Director challenges the County's standing here. And essential to the Director's argument on appeal is our Court's opinion in *Mid-Century Insurance Co. v. Estate of Morris*, 966 N.E.2d 681 (Ind. Ct. App. 2012), *trans. denied*. In that case, an insured operated a vehicle and was "involved in a collision" that resulted in serious injury to a passenger. *Id.* at 683. The passenger died either at the scene or a few days afterward,[5] and his estate offered to settle with the insurer at the per-person policy limit of $50,000. The insurer refused. The estate then filed suit against the insured, and the insurer filed a complaint for interpleader in which it sought to limit its liability to all parties to the $100,000 per-occurrence liability limit.

[16] The estate eventually obtained a judgment against the insured of about $1.2 million. In lieu of paying that judgment, the insured assigned any claims he had against the insurer to the estate. Five days later, the insurer filed its complaint for declaratory judgment against the estate. In that complaint, the insurer sought to obtain, among other things, a declaration from the court that its decision to not settle with the estate at the per-person policy limit and to instead pursue an interpleader action was "made in good faith in an attempt to protect

---

[5] In our opinion, we noted that the record on appeal was not clear on this point. *Mid-Century Ins. Co.*, 966 N.E.2d 683 n.2.

its insured from multiple claimants arising from a single occurrence . . . ." *Id.* at 684.

[17] The estate moved to dismiss the insurer's complaint, which the trial court granted. We affirmed the trial court's judgment on appeal on the ground that the insurer's pursuit of declaratory relief was not "appropriate." *Id.* at 689. We explained as follows:

> a trial court "may refuse to render or enter a declaratory judgment or decree where the judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding." Ind. Code § 34-14-1-6.
>
> When considering a motion for declaratory judgment, the test to be applied is whether the issuance of a declaratory judgment will effectively solve the problem, whether it will serve a useful purpose, and whether or not another remedy is more effective or efficient. *Dible v. City of Lafayette*, 713 N.E.2d 269, 272 (Ind. 1999) (citing *Volkswagenwerk, A.G.[ v. Watson]*, 181 Ind. App. 155, 390 N.E.2d [1082,] 1085 [(1979)]). The determinative factor is whether the declaratory action will result in a just and more expeditious and economical determination of the entire controversy. *Dible*, 713 N.E.2d at 272. The use of a declaratory judgment is discretionary with the court and is usually unnecessary where a full and adequate remedy is already provided by another form of action. *Id.* . . . "Although an action for declaratory judgment in Indiana may be appropriate to construe a contract, it is an inappropriate vehicle if its use would result in 'piecemeal' litigation." *U.S. Fidelity and Guar. Ins. Co. v. Hartson-Kennedy Cabinet Top Co. Inc.*, 857 N.E.2d 1033, 1039 (Ind. Ct. App. 2006) (citations omitted).

> Generally, an insurance company is entitled to maintain a declaratory judgment action to determine the coverage of its policies. *Ind. Lumbermens Mut. Ins. Co. v. Am. Log Homes, Inc.*, 774 N.E.2d 603, 606 (Ind. Ct. App. 2002). *"The primary purpose of declaratory relief is to permit a plaintiff to obtain a declaration of its rights and liabilities before proceeding with a course of conduct for which it might be held liable, not to declare nonliability for past conduct."* 22A AM. JUR. 2D *Declaratory Judgments* § 129 (2012). "A declaratory judgment is not available where the judgment cannot guide and protect the petitioner with regard to some future acts, such as where the insurance company has already denied the claim." *Id.*

*Id.* at 687-88 (emphasis added). We concluded that the insurer's complaint for declaratory relief simply sought to "preemptively defend" itself as to "whether its past conduct" toward its insured "was performed in good faith" and, thus, would have resulted in piecemealing the impending litigation between the estate and the insurer as to the insurer's compliance with its substantive obligation to deal with its insured in good faith. *Id.* at 689.

[18] Our opinion in *Mid-Century* is not helpful to the Director. First, he relies on it for the proposition that the County lacks standing to seek declaratory relief, which is a jurisdictional prerequisite to filing suit. *See Red Lobster Rests. LLC v. Fricke*, 234 N.E.3d 159, 167 (Ind. 2024). But *Mid-Century* is not an opinion on standing; it is an opinion on the trial court's legal discretion to dismiss a declaratory-judgment complaint where a full and adequate remedy lies in another form of action.

[19] Further, the reality of another form of action in *Mid-Century* was more than speculation. The insured had assigned any and all of his legal rights against the

insurer to the estate in lieu of paying a $1.2 million judgment. Five days later, the insurer sought declaratory relief against the estate on the estate's putative claims that the insurer had breached its duty of good faith toward the insured for not settling with the estate at the per-person policy limit. That is, the estate's claims against the insurer under a traditional form of action were both real and probable.

[20] There is no such alternative form of action here. Although the Director asserts that the veterans in Hamilton County adversely affected by Epperson's apparent nonfeasance and misfeasance may have a claim against the County, the Director is simply speculating. There are no such pending actions against the County, and the Director has designated no evidence to support the existence of any such possible actions. Further, as the County notes, the relevant statute of limitations for any such claims at least appears to have long passed. Accordingly, *Mid-Century* is inapposite here.

[21] Nonetheless, we will still consider whether the County's complaint demonstrates a "substantial *present* interest in the relief sought." *Holcomb*, 158 N.E.3d at 1256 (emphasis added; quotation marks omitted). And insofar as *Mid-Century* stands for the proposition that the "primary purpose" of declaratory relief "is to permit a plaintiff to obtain a declaration of its rights and liabilities *before* proceeding with a course of conduct," we agree with that assessment. 966 N.E.2d at 688 (emphasis added). We likewise agree with *Mid-Century*'s statement that, absent the ability to "guide and protect the petitioner

with regard to *some* future acts," declaratory relief "is not available." *Id.* (emphasis added).

[22] Here, again, the County's complaint for declaratory relief requested the trial court to declare as follows:

> a. The Director is, and at all relevant times was, responsible for supervising and evaluating [County Service Officers].
>
> b. The Director and the Department breached their statutory duties to supervise and evaluate Epperson as well as to recommend her discharge given her repeated violations of rules and her plain unfitness to perform the duties of her office or employment.

Appellant's App. Vol. 2, p. 23.

[23] The County has standing under the Declaratory Judgment Act to pursue those two claims. The claims request the court to declare the rights and obligations of the Director to "supervise" County Service Officers, and the County presently continues to employ a County Service Officer. The claims further seek to more precisely delineate the Director's apparent supervisory obligations *going forward* by using the *prior example* of Epperson's actions and the absence of any apparent supervision of Epperson by the Director. Those two claims demonstrate a substantial present interest by the County in seeking declaratory relief and further demonstrate the ability of the judiciary to provide guidance to the parties with respect to some future acts even if that guidance is couched in the

example of prior conduct. We therefore reject the Director's assertion on appeal that the County lacks standing to pursue declaratory relief.

## 2. The instant dispute is appropriate for judicial resolution.

We next address the Director's argument that the County's complaint is not justiciable, and, thus, Indiana's judiciary should abstain from deciding the questions presented in the complaint. As the Indiana Supreme Court has explained:

> justiciability is not a question of jurisdiction, but whether it is prudent for the Court to exercise its jurisdiction . . . .

> The Indiana Constitution explicitly provides for the separation of powers: "The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial; and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided." Article 3, § 1. "[A]lthough the courts have jurisdiction to review [a] case in the first instance, justiciability concerns stemming from Article 3, Section 1, caution courts to intervene only where doing so would not upset the balance of the separation of powers." *Berry [v. Crawford]*, 990 N.E.2d [410,] 418 [(Ind. 2013)]. In other words, although this Court may have subject matter jurisdiction, it may, "for prudential reasons," ultimately conclude that the issue presented is non-justiciable. *Id.* "[W]here a particular function has been expressly delegated to the legislature by our Constitution without any express constitutional limitation or qualification, disputes arising in the exercise of such functions are inappropriate for judicial resolution." *Id.* at 421.

*Citizens Action Coalition of Ind. v. Koch*, 51 N.E.3d 236, 240-41 (Ind. 2016).

[25] For example, in *Citizens Action Coalition*, our Supreme Court was asked to consider the scope of an exception to Indiana's Access to Public Records Act (APRA), which exception provided that "[t]he work product of individual members and partisan staff of the general assembly" was not subject to public disclosure. *Id.* at 242. Our Supreme Court held that a judicial determination of the scope of legislative "work product" would inappropriately interfere with the General Assembly's exercise of its discretion under that exception, and, thus, the claim was nonjusticiable. *Id.* at 243; *see also State ex rel. Masariu v. Marion Sup. Ct. No. 1*, 621 N.E.2d 1097, 1098 (Ind. 1993) (holding that an APRA request for the voting records of the House of Representatives was nonjusticiable).

[26] However, no similar exception exists under APRA for the Governor. *Groth v. Pence*, 67 N.E.3d 1104, 1115-16 (Ind. Ct. App. 2017), *trans. denied*. Thus, when he sought to withhold certain records from disclosure under the common-law understanding of "work product," we held that the disclosure request *was* justiciable. *Id.* Specifically, we held that the relevant statutory definitions and case law "d[id] not present novel legal questions," and "the Governor's prerogatives as the State's chief executive" would "remain intact" by our assessment of his compliance with that well-established law. *Id.*

[27] According to the Director, the County's claims are nonjusticiable because they ultimately require the judiciary to interpret Indiana Code section 10-17-1-9(c)'s

requirement that County Service Officers "serve under the *supervision* of" the Director. (Emphasis added.) The Director contends that it is exclusively the Executive Branch's function to determine the scope of its responsibility to supervise County Service Officers. The Director also asserts that the Department has long taken a particular position on the scope of the Director's supervisory responsibility over County Service Officers and that the judiciary should abstain from second-guessing the Department's own assessment of the Director's legal obligations.

[28] We initially note that, while not framed as such, the Director's argument here sounds in agency deference. But, as our Supreme Court recently made clear, while Indiana's judiciary may defer to an agency on factual matters within the agency's "technical expertise," that deference does not extend to saying what the law is. *Ind. Office of Util. Consumer Couns. v. Duke Energy Ind., LLC*, 248 N.E.3d 1205, 1210-11 (Ind. 2024). It would vitiate, not support, the separation of powers to "cede our core judicial function—the duty to say what the law is— to an administrative agency within the executive branch." *Id.* at 1211; *see also* Ind. Const. art. 3, § 1; art. 7, § 1. Our General Assembly also has recently declared its support for the judiciary to say what the law is in appeals under Indiana's Administrative Orders and Procedures Act by adding Indiana Code section 4-21.5-5-11 to that Act. *See* Pub. L. 128-2024 § 12 (eff. July 1, 2024). As Indiana Code section 4-21.5-5-11(b) makes clear, "[t]he court shall decide all questions of law . . . without deference to any previous interpretation made by the agency."

[29] We have little doubt that the Director is aware of those legal developments and has eschewed framing his argument around agency deference accordingly. Instead, the Director goes *even further* and requests not judicial *deference* to the Department's interpretation of a statute but wholesale judicial *abstention* whenever the Department has to determine its statutory obligations. We do not accept the Director's position for the same reasons explained by our Supreme Court in *Indiana Office of Utility Consumer Counselor.*

[30] Further, and unlike in *Citizens Action Coalition*, the statutory language here does not suggest an intent to locate a novel legal interpretation in another branch of government for that branch's own exclusive functions. The statutory language at issue here is not about how one branch of government does its own business; it is about the State's relationship to its municipalities. If the Department and the Director have correctly interpreted and applied the statute, then, like the Governor in *Groth*, they can argue as much to the courts.

[31] Nothing in our resolution of this dispute between a county and the State, regarding legislative language establishing an apparent duty on the Executive Branch to that county, cautions against judicial resolution under a separation-of-powers theory. To the contrary, resolution by the independent judiciary is eminently prudent here, and giving the Executive Branch the sole power to interpret its legislative obligations to municipalities would undermine the separation of powers, not sustain it. *Cf. Morales v. Rust*, 228 N.E.3d 1025, 1045 (Ind. 2024) ("it is 'emphatically the province and duty of the judicial department to say what the law is.'") (quoting *Marbury v. Madison*, 1 Cranch

137, 177 (1803)) (emphasis removed). Accordingly, we hold that the County's complaint is justiciable.

## 3. The trial court correctly interpreted the Indiana Code to impose on the Director an obligation to "supervise" County Service Officers.

[32] We thus turn to the gravamen of the County's complaint, namely, whether the Indiana Code imposes a duty on the Director to supervise County Service Officers. The County's request for declaratory relief on this issue requires us to interpret the Indiana Code. As our Supreme Court has made clear, we interpret a statute by giving its words their plain meaning. *Id.* at 1054. "When those words are clear and unambiguous, we simply apply their plain meaning, without resorting to other canons of statutory construction." *Ind. Right to Life Victory Fund v. Morales*, 217 N.E.3d 517, 524 (Ind. 2023) (quoting *Rogers v. Martin*, 63 N.E.3d 316, 327 (Ind. 2016)). And when a statutory term is undefined, "the legislature directs us to interpret the term using its 'plain, or ordinary and usual, sense.'" *Rainbow Realty Grp., Inc. v. Carter*, 131 N.E.3d 168, 174 (Ind. 2019) (quoting I.C. § 1-1-4-1(1)). We do so by consulting "general-language dictionaries." *Id.*

[33] Indiana Code section 10-17-1-9(c)(3) states that, where the remuneration and expenses of an employed County Service Officer "are paid from the funds of the county," that County Service Officer shall "serve *under the supervision of the director* of veterans' affairs." (Emphasis added.) The enacted language of that statute speaks for itself, and there is therefore no other canon of statutory

construction for us to apply to it.[6] County Service Officers are to "serve under the supervision of" the Director.

[34] "Supervision" is not defined in that statute or in another relevant statute. We therefore must apply the general-language understanding of the word. *Rainbow Realty Grp.*, 131 N.E.3d at 174. To "supervise" means to be "in charge of" or "oversee," and "supervision" means doing so "especially" by way of "critical[ly] watching and directing . . . activities." *Supervise*, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/supervising (last accessed Feb. 12, 2025); *Supervision*, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/supervision (last accessed Feb. 12, 2025). Thus, Indiana Code section 10-17-1-9(c)(3) affirmatively establishes that the Director "shall" be "in charge of" and "oversee" County Service Officers by "critical[ly] watching and directing" their "activities."

[35] Nonetheless, the Director argues that the statute is ambiguous because "supervision" is a nebulous term that could encompass broad or narrow responsibilities. But the Director's argument is not an argument on *meaning*, it is an argument on *implementation*. "Supervision" is a well-defined word in any

---

[6] The Director argues that his statutory duties are contained in Indiana Code section 10-17-1-6(b). However, as we conclude that Indiana Code section 10-17-1-9(c)(3) is unambiguous on its face, there is nothing for us to interpret, and considering even *in pari materia* statutes is not appropriate in discerning the meaning of an unambiguous statute. *Cmty. Hosp. of Anderson & Madison Cnty. v. McKnight*, 493 N.E.2d 775, 777 (Ind. 1986). That said, we consider the Director's argument under section 10-17-1-6(b) in part 4, below, with respect to whether his actions under that statute were sufficient to also meet his supervisory obligations under section 10-17-1-9(c)(3).

general-language sense, and we have no discretion to read it broadly or narrowly. Indeed, the words "supervise" and "supervision" appear hundreds of times in the Indiana Code. Yet the Director cites no authority from Indiana's appellate courts that has ever found any of those uses to be ambiguous. As for whether the designated evidence demonstrates that the Director *in fact* sufficiently complied with the statutory language, that is not a question of the statute's meaning, and we instead address that question in part 4 below.

[36] The Director also argues that Indiana Code section 10-17-1-9 is ambiguous because it calls for counties to employ County Service Officers while also calling for the Director to supervise them. And yet the Director's argument shows that he has no difficulty in identifying exactly what the statute says: the counties hire the County Service Officers and the Director supervises them. The policy choices made by our General Assembly with respect to who hires and pays the County Service Officers and with respect to who supervises them do not create a statutory ambiguity. Further, the Department itself has promulgated a rule that makes clear that, when a County Service Officer fails to satisfactorily do his or her job, the Department will recommend termination of the County Service Officer's employment to the employing county. Thus, it is clear that the Department understands the statute's moving parts.

[37] Finally, the Director argues that Indiana Code section 10-17-1-9 speaks to the employment requirements of County Service Officers and not any purported duty on the Director to supervise them. This argument is a distinction without a difference; if a requirement of employment is to serve under the supervision of

the Director, it is equally true that the Director has the obligation to supervise the employee.[7]

[38] We separately consider an argument proffered by *amici* Veterans' Associations. In particular, the Veterans' Associations contend that, the plain language of Indiana Code section 10-17-1-9 notwithstanding, it would be "absurd" for the judiciary to actually apply that plain language. *See* Veterans' Associations' Br. at 27. As our Supreme Court has explained, the "absurdity doctrine" is

> a narrow, limited exception to our interpretive canon that a statute's plain meaning controls. For the absurdity doctrine to apply, we require two showings. First, the text must impose an outcome no reasonable person could intend; and, second, a court must be able to fix the resulting absurdity by changing or supplying a particular word or phrase whose inclusion or omission was obviously a technical or ministerial error.

*K.C.G. v. State*, 156 N.E.3d 1281, 1284 (Ind. 2020) (cleaned up). According to the Veterans' Associations, giving Indiana Code section 10-17-1-9(c)(3) its plain meaning is absurd (or, rather, unjust) because it will likely adversely affect their funding. They further note that the "presence of legislators" on the Commission

---

[7] Our General Assembly is aware of the Director's concerns under Indiana Code sections 10-17-1-9(c)(3) and 10-17-1-6(b). This legislative session, Senate Bill 433 passed out of the Senate and is currently being considered by the House of Representatives. Senate Bill 433, if enacted into law in its current form, would delete section 10-17-1-9(c)(3) and clarify the Director's obligations under section 10-17-1-6(b). Further, the bill would more clearly articulate accreditation, training, testing, and reporting requirements imposed by the Department on County Service Officers.

demonstrates that the Department is "well-informed" as to the statutory obligations of the Director. Veterans' Associations' Br. at 28.

[39] Neither of the Veterans' Associations' concerns demonstrates that the plain language of the statute should be disregarded under the absurdity doctrine. It is eminently reasonable for the enacted language to partition hiring authority and supervisory authority; one speaks to identifying an appropriate community representative, the other speaks to maintaining an appropriate standard of care across the state in service to our veterans. As for the presence of legislators on the Commission, our Supreme Court has long made clear that the opinion of one or even several legislators is not informative to how the judiciary interprets the enacted language of a statute. *See, e.g.*, *A Woman's Choice—East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 110 (Ind. 1996) ("In interpreting statutes, we do not impute the opinions of one legislator, even a bill's sponsor, to the entire legislature unless those views find statutory expression.").

[40] Accordingly, we agree with the trial court's reading of Indiana Code section 10-17-1-9 and hold that the statute unambiguously requires the Director to supervise County Service Officers.[8]

---

[8] *Amici* Veterans' Associations separately asks that we find the County to be estopped from asserting that County Service Officers serve under the supervision of the Director. The parties did not argue a theory of estoppel to the trial court, and we will not consider any such theory for the first time on appellate review of the trial court's judgment.

## 4. The designated evidence establishes that the Director does not "supervise" County Service Officers.

The last issue in this appeal is whether the designated evidence demonstrates that the Director in fact supervised or failed to supervise County Service Officers. Applying our analysis from part 3 above here, we thus consider whether the designated evidence demonstrates that the Director engaged in a "critical watching and directing" of the "activities" of County Service Officers.

And the designated evidence makes clear that the Director engaged in nothing of the sort. In his deposition, the Director expressly testified that he did *not* supervise County Service Officers because he believed it was the job of the counties to supervise them. And the example of Epperson proves the point. There is no dispute that, under the general-language understanding of the word, the Director in no way whatsoever "supervised" her activities as County Service Officer. He did not act in charge of her activities; he did not oversee or watch over her activities; and he did not direct her activities in any way or at any time.

Nonetheless, the Director argues on appeal that by fulfilling other statutory obligations of his role he implicitly fulfilled his obligation to supervise County Service Officers. We initially note that the Director's argument on appeal is contrary to his own deposition testimony that he did not supervise County Service Officers because he considered that to be the obligation of the counties. Regardless, however, he now asserts that he has fulfilled his obligation to

supervise County Service Officers by following Indiana Code section 10-17-1-6(b), which states:

> The duties of the director *include* the following:
>
> (1) To attend all meetings of the commission and to act as secretary and keep minutes of the commission's proceedings.
>
> (2) To appoint the employees of the department necessary to carry out this chapter and to fix the compensation of the employees. Employees of the department must qualify for the job concerned.
>
> (3) To carry out the program for veterans' affairs as directed by the governor and the commission.
>
> (4) To carry on field direction, inspection, and coordination of county and city service officers as provided in this chapter.
>
> (5) To prepare and conduct service officer training schools with the voluntary aid and assistance of the service staffs of the major veterans' organizations.
>
> (6) To maintain an information bulletin service to county and city service officers for the necessary dissemination of material pertaining to all phases of veterans' rehabilitation and service work, including information necessary to inform veterans of the provisions of IC 22-9-10.
>
> (7) To perform the duties described in IC 10-17-11 for the Indiana state veterans' cemetery.

(8) To perform the duties described in IC 10-17-12 for the military family relief fund.

(9) To establish a program and set guidelines under which a medal of honor recipient may receive compensation when attending and participating in official ceremonies.

(Emphasis added.)

[44]    We acknowledge the Director's testimony regarding his fulfillment of the obligations of his role as provided for in Indiana Code section 10-17-1-6(b). But, here, he reads those obligations to implicitly cover section 10-17-1-9(c)(3)'s separate requirement that he supervise County Service Officers. That is not correct for two reasons. First, section 10-17-1-6(b) is expressly *not* an exhaustive list of the Director's obligations, which means obligations of his role may be found elsewhere. Second, adopting the Director's reading that compliance with section 10-17-1-6(b)'s obligations implicitly captures his separate obligation to supervise County Service Officers would render section 10-17-1-9(c)(3) redundant in the Indiana Code, which is not how the judiciary reads statutes. *E.g.*, *Ind. Office of Util. Consumer Couns.*, 248 N.E.3d at 1213-14.

[45]    Finally, the Director asserts that the statutory requirement for him to "supervise" County Service Officers does not require him to supervise their "daily activities." Appellant's Br. at 44. Nothing in this opinion says otherwise. But there is a vast gulf between sufficiently meeting a statutory obligation to supervise and *daily* supervision; our opinion today recognizes what the statute says—that the Director must supervise County Service Officers—and that doing

*nothing* to meet that obligation is insufficient. We will not speculate on how the Director might sufficiently meet his obligation to supervise County Service Officers under Indiana Code section 10-17-1-9(c)(3).

## Conclusion

For all of these reasons, we affirm the trial court's entry of summary judgment for the County and its denial of the Director's motion for summary judgment.

Affirmed.

Pyle, J., and Foley, J., concur.

ATTORNEYS FOR APPELLANT

Theodore E. Rokita
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Adam S. Willfond
Hamilton County Legal Department
Noblesville, Indiana

Blake J. Burgan
Kristine A. Gordon
Donald E. Morgan
Taft Stettinius & Hollister
Indianapolis, Indiana


ATTORNEYS FOR AMICI CURIAE VETERANS' ASSOCIATIONS

Maggie L. Smith
Darren A. Craig

Frost Brown Todd LLP
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE THE INDIANA ASSOCIATION OF COUNTY COMMISSIONERS

Mark J. Crandley
Barnes & Thornburg LLP
Indianapolis, Indiana